# Illinois Official Reports

## Appellate Court

***People v. Barnes*, 2017 IL App (1st) 143902**

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MITCHELL BARNES, Defendant-Appellant. |
| District & No. | First District, Fourth Division<br>Docket No. 1-14-3902 |
| Filed | November 30, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 11-CR-14718; the Hon. Bridget Jane Hughes, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Michael J. Pelletier, Patricia Mysza, and Lauren A. Bauser, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Christine Cook, and Gavin P. Quinn, Assistant State's Attorneys, of counsel), for the People. |
| Panel | PRESIDING JUSTICE BURKE delivered the judgment of the court, with opinion.<br>Justices McBride and Ellis concurred in the judgment and opinion. |

**OPINION**

¶ 1      Following a jury trial, defendant Mitchell Barnes was found guilty of home invasion and robbery, then sentenced by the trial court to consecutive terms of imprisonment of 18 years and 5 years, respectively. On appeal, defendant contends that (1) he was denied the right to a fair trial where the court prohibited him from presenting evidence of the victim's prior convictions to support his claim of self-defense, (2) the court displayed "antagonism and bias" toward defense counsel in the jury's presence, and (3) the court increased his mandatory minimum sentence by finding that he caused great bodily harm to the victim, even though that issue was not presented to the jury for a finding beyond a reasonable doubt. Defendant also contends that his sentence is excessive in light of his youth, lack of criminal background, and rehabilitative potential. For the reasons that follow, we affirm the judgment of the circuit court.

¶ 2                              I. BACKGROUND

¶ 3                            A. State Witnesses

¶ 4      William Mallette testified that on August 12, 2011, he was staying in room 251 at the Homestead Suites hotel in Schaumburg, Illinois. That night, he left the hotel at 9 p.m. for dinner, returned to the hotel to change his clothes, and then left the hotel again to go to a bar. He returned to the hotel that night and smoked a cigarette in the hotel's designated smoking area. Three males, two black and one white, were also in the smoking area. They were discussing drugs, but Mallette told them that he was too old for that. He went back into the hotel, taking his money clip out of his pocket to retrieve his hotel keycard, and then returned to his room where he fell asleep.

¶ 5      He was awakened later that night by "very aggressive" knocking on his hotel room door. The person knocking told him through the door that the hotel was on fire. Mallette opened the door to his room where he saw a tall, black male, who punched him in the head. Mallette was not sure if the black male was one of the people he had seen earlier that night while he was smoking outside. The black male rushed the door, and a white male entered the room behind him. The two males attacked Mallette with a "barrage of punches." Mallette testified that he was being hit so hard and fast that he went to the ground to try to protect himself. The fight started in the kitchen area of Mallette's hotel room, but the two males dragged him into the living area where they continued to punch and kick him.

¶ 6      The black male punched him in the ribs, face, and kidneys, and Mallette asked them what they wanted. The black male told him that they were there to "rob and kill [him]." The white male pinned Mallette on his stomach while the black male kicked him in the ribs and stomped on the side of his face. The black male then got onto the bed and then jumped off the bed onto Mallette's lower back. Mallette lost track of the white male, and the black male threw Mallette onto the bed face down. The black male got on top of Mallette and put his arms around his neck and tried to twist it. Mallette testified that he felt like the black male was trying to "rip [his] neck off [his] body." The black male told Mallette that, if he stopped fighting, he would snap his neck, and it would be over.

¶ 7      Mallette tried to bite the black male's arm, which startled him, and Mallette was able to break free from the chokehold. Mallette punched the black male in the face and in the groin. However, the black male was able to put Mallette back into a chokehold and continued trying

to break his neck. Mallette lifted the black male up onto his back and tried to run through the nearby window, but he did not make it out. The black male continued punching Mallette and then threw him facedown onto the bed. The black male stood on top of the back of Mallette's head and neck and pushed off the ceiling, forcing Mallette's face down into the mattress with his foot. Mallette lost consciousness.

¶ 8    When he regained consciousness, there was no one else in the room. He called the front desk of the hotel and the police and stated that he was in excruciating pain, could barely move, and believed his lung was punctured. The police and paramedics transported him to the hospital, where he stayed for one week. He discovered that his wallet, credit cards, driver's license, and cash were missing from his room. He testified that he has constant back pain as a result of the injuries he suffered that night.

¶ 9    On cross-examination, Mallette stated that he did not have any drugs in his system on the night of the incident but acknowledged that he drank several beers at dinner and at the bar that night. He denied offering defendant money for oral sex and denied touching any of the three males he saw outside while he was smoking a cigarette before the incident. He further stated that he had complained to the hotel management several times about the three males because they would smoke marijuana and drink beer in the hotel.

¶ 10   Joseph Stein testified that there were charges pending against him in relation to the incident with Mallette and that, in exchange for his testimony, he was agreeing to plead guilty to a charge of robbery and all other charges against him would be dismissed and the State would recommend a sentence of six years with boot camp. He testified that in August 2011 he was homeless and was friends with Joseph Pinsel, who lived at the Homestead Suites in Schaumburg. He testified that he would visit Pinsel at the Homestead Suites, where they would hang out with Gerard Golston and defendant, who were both students at Harper College. On August 12, 2011, he and Golston went to the Homestead Suites around 6 p.m. to visit Pinsel. They were drinking alcohol and smoking marijuana in Pinsel's room and then went outside to smoke cigarettes. Golston and Stein testified that while they were in the hotel's designed smoking area, Mallette approached them.

¶ 11   Stein testified that Mallette made "racial remarks" toward Golston and then put his arms around Stein and hold him that he was cute. Golston could not hear what Mallette said about him, but saw him touching Stein. Stein told Mallette to leave him alone and that he was a homophobe. Mallette asked Pinsel if he knew where he could get any cocaine and then showed the group some cash in a money clip. Mallette went back into the hotel, and Stein, Pinsel, and Golston returned to Pinsel's room. Defendant joined them in Pinsel's room, and Pinsel told him about the money clip and said that he wanted to try to steal it. Golston testified, however, that it was defendant's idea to steal the money clip and that defendant was the first person to suggest robbing Mallette. Defendant started to formulate a plan to steal the money clip whereby defendant would knock on Mallette's hotel room door and tackle or hit him when he opened the door. Then, Golston would go into the room and take the money clip while Stein waited outside in case defendant needed help with Mallette. Pinsel was supposed to stay in the hallway and be a lookout.

¶ 12   Defendant and Stein left the room, but Golston testified that he and Pinsel stayed in the room because Golston did not want to take part in the plan. Once Golston saw defendant knock on Mallette's door, Golston ran out of the hotel and went to the convenience store across the street. Stein testified that he was behind a wall when defendant knocked on the door, but after

Mallette opened the door, Stein testified that he heard a "boom," as if defendant had tackled Mallette. Stein entered the room and saw defendant and Mallette fighting. Defendant was punching Mallette in the face and ribs and then started choking him. Stein grabbed the money clip from the kitchen counter and told defendant to leave with him. Defendant did not stop choking Mallette, however, and told Mallette that he was going to kill him. Stein ran outside to the parking lot, and defendant came out 45 minutes later wearing different clothes and shoes. Defendant told Stein that he changed clothes because he had blood on the clothes he had been wearing. He also told Stein that he was not sure if he killed Mallette or if he just hurt him badly. Stein observed that defendant had swollen knuckles and a bite mark on his arm.

¶ 13 Stein and defendant drove to a gas station and tried to use a credit card from Mallette's money clip to buy gas, but the card did not work. They then went to Denny's and used a debit card from the money clip to pay for their meal. When they returned to the Homestead Suites, they saw a police vehicle or ambulance in the parking lot, so they parked in the parking lot across the street from the hotel. They returned to the Homestead Suites after the emergency vehicle left, and Stein returned to Pinsel's room while defendant went back to his own room. Golston testified that later that night police officers knocked on Pinsel's hotel room door and they spoke to the officers. Golston further testified that the next day he saw defendant with Mallette's money clip. On cross-examination, Stein testified that after they saw Mallette outside in the smoking area, Stein went to his room to apologize for telling him that he was a homophobe. Stein stated that this was Pinsel's idea because Pinsel wanted to see if he could see the money clip inside the room so that they could steal it.

¶ 14 Schaumburg police officer Jim Hackett testified that on August 13, 2011, at 4:45 a.m., he was assigned to a battery at the Homestead Suites hotel. When he arrived, he observed two officers and paramedics were already with Mallette in room 251. He spoke with Mallette for less than one minute and, as a result of the conversation, went to speak with the occupants of room 254. He spoke to Mallette later that day in the hospital and noticed injuries to his face and legs. On cross-examination, Officer Hackett stated that Mallette told him he had "contact" with two black males and one Hispanic male, but the 911 call said three black males had been involved in the incident. He also stated that Mallette told him that "the black guy in room 254 just kicked my ass." Officer Hackett stated that he had an issue with Mallette's timeline of the events because Mallette told him the attack occurred 20 minutes before the 911 call at 4:45 a.m. but also said that the attack occurred between 1:30 and 1:50 a.m.

¶ 15 Dr. Elizabeth Schupp was qualified as an expert in the field of critical care medicine and pulmonary medicine and testified that she treated Mallette at the hospital on August 13, 2011. She noted that he was having trouble moving his lower extremities and complained of chest pain. Mallette told her that he had been assaulted in a hotel room, and she observed that he had the imprint of the sole of a shoe near his right ear. He repeated the version of events as recounted in his testimony but told Dr. Schupp he had lain still on the ground because he thought the two men would leave if he played dead and did not tell her that he lost consciousness. Dr. Schupp took an X-ray of his chest and discovered a partially collapsed lung. Dr. Schupp could tell from the X-ray that Mallette had previously sustained injuries to the right side of his chest and collarbone, but he had recovered from those injuries.

¶ 16 Dr. Schupp noted that although Mallette denied drug use, his drug screen tested positive for opiates. Dr. Schupp opined that the positive drug screen could be explained by the fact that the paramedics gave Mallette a Fentanyl IV in the ambulance. Dr. Schupp took Computerized

Tomography (CT) scans of Mallette's chest and back. She observed a contusion to his right lung and fractures of the transverse L2 and L3 lumbar spine. Dr. Schupp testified that a lot of force, 200 or 300 pounds of force, is required to fracture the transverse spine. The chest CT also showed a deflation of the right lung and three rib fractures.[1] Dr. Schupp also took a CT scan of Mallette's neck, which showed a fracture of the thyroid cartilage. Dr. Schupp testified that the thyroid cartilage can be fractured when someone tries to choke another person. She also testified that fractured thyroid cartilage is a very rare injury because it takes a lot of force to fracture the cartilage. Dr. Schupp explained that a fractured thyroid cartilage can be a life-threatening injury.

¶ 17    Dr. Schupp learned that Mallette was HIV positive but did not believe his HIV status had any effect on his injuries. She testified that she did not see very many people with the level of trauma Mallette exhibited. She testified that she was particularly "impressed" with the fact that Mallette had the imprint of a boot mark on his cheek because it meant that someone had stepped down on him with a lot of force while he was lying down. She further testified that the information Mallette provided her about the incident was "very consistent" with the injuries he exhibited. On cross-examination, Dr. Schupp acknowledged that at the time he arrived at the hospital, Mallette's blood alcohol concentration was 0.162, well above the legal limit of 0.08.

¶ 18    Schaumburg police sergeant Greg Klebba testified that he was previously a detective with the criminal investigations bureau and was assigned to investigate the incident at issue in this case. He read the reports of officers who had previously worked on the case and then began looking for Mallette, defendant, and Pinsel. He spoke to Mallette at the hospital with his partner, Detective Tillema. He then went to the Homestead Suites, where he learned that defendant and Pinsel had been asked to leave the hotel. He went to defendant's room and found a pair of high top shoes with a red stain on them that Sergeant Klebba thought could have been blood. The blood was later swabbed and sent to the Illinois State Police Crime Lab for testing in conjunction with a buccal swab from Mallette. The testing showed that the blood on the shoes was consistent with having originated from Mallette.

¶ 19    Sergeant Klebba learned that Pinsel was staying at another hotel in Hanover Park. Another detective interviewed Pinsel, and while he did, Stein arrived. Both Stein and Pinsel were taken to the Schaumburg police department, where Stein gave a statement to police. Pinsel returned to the Schaumburg police department a few days later, and Sergeant Klebba learned that defendant was staying at 5628 South Michigan Avenue in Chicago.

¶ 20    Sergeant Klebba and a team of officers and U.S. Marshals followed Pinsel to that address. Sergeant Klebba observed defendant enter Pinsel's vehicle, and U.S. Marshals surrounded the vehicle. Sergeant Klebba arrested defendant and took him to the Schaumburg police department. On cross-examination, Sergeant Klebba acknowledged that Mallette told him that he was unconscious after the attack and that Officer Hackett's report of the incident was not accurate.

¶ 21    Assistant State's Attorney (ASA) Michael O'Malley testified that he met with defendant at the Schaumburg police department on the evening of August 18, 2011. He gave defendant his *Miranda* warnings, and defendant agreed to speak with him. Defendant's account was memorialized in a typewritten statement, which ASA O'Malley typed while defendant was

---

[1]Dr. Schupp also observed two old rib fractures on Mallette's CT scan that she testified were a result of a motor vehicle accident Mallette had been injured in before the incident.

sitting next to him. ASA O'Malley testified that defendant reviewed the completed statement and was able to make corrections, which were marked by defendant's handwritten initials. ASA O'Malley then published defendant's statement to the jury.

¶ 22 In the statement, defendant acknowledged that he was smoking marijuana and drinking alcohol in Pinsel's hotel room with Golston and Stein on the night of the incident. Stein and Pinsel told him that a "gay guy" (Mallette) had hit on Stein and said racist remarks to Golston. Defendant also learned from them that Mallette had $500 in cash in a money clip and that he was staying in the hotel room across the hallway from Pinsel's room. Defendant stated that everyone started talking about robbing Mallette and the plan was that defendant would knock on the door and when Mallette opened the door, he and Stein would hold him or knock him out. Golston would then enter the room and grab the money, and Pinsel would be the lookout.

¶ 23 Defendant knocked on Mallette's hotel room door, and when Mallette answered, defendant grabbed him, tackled him into the room, and put him into a chokehold, but Mallette did not pass out. After a few minutes, Stein entered the room and kicked Mallette while defendant was choking him. Stein grabbed something from inside the room, but defendant could not see what it was. Stein then left the room, but defendant kept choking Mallette. Mallette tried to bite him, so defendant briefly released him but then put him into another chokehold. Mallette then tried to grab defendant's crotch, and defendant "freaked out" because he had been sexually assaulted by his brother when he was younger. Defendant worried that he could not leave Mallette conscious, so he clasped his hands together and slammed them down on the back of Mallette's neck and then started elbowing Mallette's spine. Defendant told him that he was going to knock him out and kept kicking and punching him while Mallette was on the floor. Defendant then stomped on Mallette's spine with the heel of his right foot "because [the heel] is the hardest part of the foot." Defendant also stomped on Mallette's head with his heel. Mallette stopped moving, and defendant left the room.

¶ 24 Defendant stated that the fight lasted about 30 minutes and, after he left Mallette's hotel room, he went back to his own room and changed his clothes, including the red shoes he had been wearing during the fight. Defendant was worried he might have killed Mallette. After changing clothes, he met up with Stein, and the two of them went to a gas station. They tried to use the credit cards from Mallette's money clip to pay for gas, but the cards did not work. They then went to Denny's and used one of the debit cards to pay for their food. Defendant stated that Stein signed the receipt.

¶ 25 **B. Defense Witnesses**

¶ 26 Schaumburg police officer Troy Stanley testified on behalf of defendant that on August 13, 2011, he responded to a battery at the Homestead Suites hotel. There, he spoke with Mallette, who told him that, after he heard a knock at his hotel room door, he looked though the peephole and recognized a black male he had been smoking with outside earlier that night. He opened the door, and the black male began punching him and demanded $1000. Officer Stanley acknowledged that Mallette did not say anything about the black male choking him or trying to break his neck. Mallette told Officer Stanley that the black male left the room after kicking him. On cross-examination, Officer Stanley stated that he was the first officer on the scene and arrived before the paramedics. He also acknowledged that when he arrived, Mallette was bleeding and in obvious pain.

¶ 27    Michael Hansen, a firefighter and paramedic for the village of Schaumburg, testified that he treated Mallette before he was taken to the hospital. Hansen testified that Mallette told him that he was assaulted by three people in his hotel room but did not mention anyone choking him or trying to break his neck. Hansen noted that Mallette had swelling and a boot print on his face. On cross-examination, Hansen stated that he gave Mallette a Fentanyl IV in the ambulance, which is an opiate, and that Mallette complained of pain in his chest and back.

¶ 28    Defendant testified that in August 2011 he was attending Harper College in Palatine, Illinois. He attended the college on a full-time sports and educational scholarship, and his father paid the remainder of his expenses. Harper College did not have dorms but had an arrangement with the Homestead Suites to offer Harper College students discounted rates. On August 12, 2011, he was speaking with Stein at the Homestead Suites, and as a result of their conversation, defendant went to room 251 at the hotel. He knocked on the door, and Mallette opened it and told him to come in. Mallette said "you finally made it," but defendant had never seen Mallette before. Mallette told defendant to "show [him] something," and defendant removed his shirt. Mallette started walking around and touching defendant.

¶ 29    Mallette then asked defendant to perform oral sex on him, and defendant agreed, but then Mallette changed his mind and asked if defendant would have anal sex with him. Mallette told defendant that if he did not want to, he would pay him to do so, but defendant stated that he did not need any money. Mallette asked defendant if he would consider having sexual intercourse with him without using a condom, but defendant said that he would not. Defendant started to leave, and Mallette asked him why he came up to his room. Mallette then grabbed defendant on the arm and asked him where he was going. Defendant pushed Mallette in the chest, and Mallette grabbed defendant's neck and told him to get on the bed. Defendant testified that this interaction brought back memories of when he was raped by his older brother when he was 10 years old.

¶ 30    Defendant was afraid Mallette was going to rape him, so he punched him in the nose. Defendant kept punching him and fighting with him and was eventually able to leave the room. Defendant called Stein, and the two of them went to Denny's. Stein paid for their meal, and defendant testified that he believed Stein had used his own credit card to pay. Defendant was arrested on August 18, 2011, and taken to the police station.

¶ 31    The officers at the police station told defendant that he could go home if he signed a statement admitting that he committed a robbery with Stein and Pinsel, but defendant refused to sign the statement. Defendant testified that he was interviewed by multiple officers and eventually an ASA walked into the interview room with a statement saying that defendant had robbed and attacked Mallette. Defendant had not seen the statement before and did not agree with its contents but signed it anyway because he thought he would be able to leave if he did so. On cross-examination, defendant acknowledged that he did not call police after the incident with Mallette.

¶ 32                                    C. Verdict and Sentencing

¶ 33    Following closing argument, the jury found defendant guilty of home invasion and robbery. At the subsequent sentencing hearing, defense counsel argued in mitigation that defendant had no criminal background and noted defendant's potential for rehabilitation based on his supportive family. Defense counsel also pointed out defendant's age, 22 years old at the time of sentencing, and the fact that he was attending college at the time of offense. Defense

counsel also noted defendant's "troubled background," which included being put up for adoption by his birth parents and being molested at a young age by his older brother. Defense counsel also acknowledged that, for purposes of sentencing, the court would have to determine whether Mallette suffered great bodily harm and noted that, although the injuries in this case were severe, they were not permanent. In aggravation, the State focused on Mallette's injuries as detailed by Dr. Schupp and contended that based on her testimony defendant caused serious harm, which was a factor the court should consider.

¶ 34    In sentencing defendant, the court noted that it found the testimony of Dr. Schupp to be particularly significant. The court noted that it already made a finding that Mallette suffered great bodily injury, which allowed the court to consider home invasion as a triggering offense to the robbery, so that the terms of imprisonment could be imposed consecutively. The court stated that it had reviewed all the statutory factors in mitigation and aggravation. The court found that "one of the most significant" factors in aggravation was the injuries to Mallette. The court also found that defendant's lack of criminal background was "the significant factor" in mitigation. The court thus sentenced defendant, as a Class X offender, to consecutive terms of imprisonment of 18 years for home invasion and 5 years for robbery, to be served at a minimum of 85% instead of 50% time because of the court's finding that defendant had caused great bodily harm to Mallette. In denying defendant's motion to reconsider his sentence, the court found the fact that defendant caused great bodily harm was shown by the evidence.

¶ 35                                    II. ANALYSIS

¶ 36    On appeal, defendant raises four contentions. First, he asserts that the trial court erred in prohibiting him from supporting his claim of self-defense by introducing evidence of Mallette's prior convictions for violent acts. Defendant also asserts that the court's "antagonism and bias" against defense counsel in front of the jury deprived defendant of a fair and impartial trial where the case was a "credibility contest" between defendant and the State's witnesses. Defendant further maintains that the court erred in finding that he caused great bodily harm to Mallette and increasing his mandatory minimum sentence where that fact was not submitted to the jury and found beyond a reasonable doubt. Finally, defendant contends that his sentence is excessive in light of his young age, lack of criminal background, and other mitigating factors that demonstrate his rehabilitative potential.

¶ 37                         A. Mallette's Prior Convictions

¶ 38    Defendant first contends that the court erred in prohibiting him from supporting his theory of self-defense by introducing evidence of Mallette's prior convictions for violent acts. Defendant asserts that his defense at trial was that it was Mallette who initiated the fight after defendant refused his sexual advances and defendant injured Mallette while attempting to protect himself. Defendant intended to support his defense, pursuant to *People v. Lynch*, 104 Ill. 2d 194 (1984), with evidence of Mallette's prior criminal convictions from 1991 for battery and for resisting arrest.

¶ 39                            1. *Standard of Review*

¶ 40    A trial court's ruling regarding the admission of evidence will not be reversed on appeal absent an abuse of discretion. *People v. Becker*, 239 Ill. 2d 215, 234 (2010). A court abuses its discretion where its decision is arbitrary, fanciful, or unreasonable, or where no reasonable

person would adopt the view taken by the trial court. *Id.*

¶ 41                                    2. People v. Lynch

¶ 42        Where a defendant raises a theory of self-defense, he may offer evidence of the victim's aggressive or violent character under one of two circumstances. *Lynch*, 104 Ill. 2d at 199-200. If the defendant knew of the victim's violent character or prior criminal acts, the evidence may be offered to support the defendant's contention that he reasonably believed the use of force in self-defense was justified. *Id.* at 200. That circumstance is not present in this case, as defendant never claimed to be aware of Mallette's criminal record prior to the incident in question. A defendant may also present evidence of the victim's violent character where there are conflicting witness accounts about how the events in question transpired and the evidence proffered by the defendant serves to bolster his claim that the victim was the initial aggressor. *Id.* Defendant asserts that this second prong of *Lynch* applies in this case. Evidence under the second prong of *Lynch* is admissible only if it constitutes "reasonably reliable evidence of a violent character." *Id.* at 201. This court has held that the supreme court in *Lynch* "stopped short of holding that refusal to admit such evidence [of the victim's prior convictions for violent crimes] is *per se* prejudicial and, thus, preserved the trial court's discretion to exclude it based upon the facts of each case." *People v. Armstrong*, 273 Ill. App. 3d 531, 534 (1995).

¶ 43                              3. *Mallette's Prior Convictions*

¶ 44        Prior to trial, defendant filed a motion *in limine*, which contained his contentions pursuant to *Lynch*. This motion, however, is not included in the record filed on appeal. Nonetheless, our review of this issue is not hindered where there is sufficient information to support the trial court's ruling included in the report of proceedings. The court discussed the prior convictions with defense counsel and the State prior to trial and instructed defense counsel to get more information about the convictions but noted that the convictions occurred 21 years before the incident. The court therefore granted the State's request that defense counsel be precluded from mentioning Mallette's prior convictions in opening statements so that the court could determine how relevant and probative the convictions were.

¶ 45        Prior to cross-examining Mallette, the court held a sidebar outside the presence of the jury where defense counsel informed the court about the circumstances leading to Mallette's convictions for resisting arrest and battery.[2] The two offenses precipitating the convictions occurred "four or five days apart from each other" and were pled together. The complaint alleged that police officers arrived at an apartment in response to a fight in progress between two male subjects. The officers knocked on the apartment door, and Mallette answered and started yelling at the officers. The officers attempted to enter the apartment, and Mallette closed the apartment door on one officer's hands. The officers then entered the apartment to handcuff Mallette, and he "resisted some more."

---

[2]We note that the State and defense counsel disagreed over whether the prior conviction was for "straight battery" or for domestic battery. Defense counsel asserted that the complaint charged Mallette with domestic battery, and in his brief before this court, defendant asserts that the prior conviction was for domestic battery. The State maintains that the victim was a police officer and, therefore, the charge must have been for battery. We find the distinction is not relevant to either the trial court's ruling on this issue or to our review of the court's ruling.

¶ 46    After hearing argument from both defense counsel and the State, the court ruled that it was going to exclude the evidence of the prior convictions "simply on the basis that [they were] 21 years old." The court noted that although there was battery against a police officer, the "sole reason" the court was excluding the evidence of the prior convictions was the "remoteness in time from the date that the incident [in this case] occurred and the date that [Mallette] was convicted of [the prior] offense." Defense counsel asked the court if length of time was another element of *Lynch*, but the court stated that it was within its discretion to not allow the prior convictions in as evidence. Following Mallette's testimony, the court clarified its ruling, stating that it did not allow evidence of the prior convictions to be presented to the jury because the only evidence that had been presented at trial so far was Mallette's testimony, which did not include any indication that defendant acted in self-defense. The court also noted that the court in *Lynch* discussed the timing of the prior convictions, noting that the prior convictions in that case were "very recent" in relation to the incident at issue. Accordingly, the court observed that because the supreme court in *Lynch* considered the length of time that had passed since the prior convictions, the trial court could do so as well in this case.

¶ 47                                     4. *Remoteness Under* Lynch

¶ 48    Defendant now contends that the court erred in excluding evidence of Mallette's prior convictions solely on the basis of their remoteness in time. Defendant asserts that the passage of time is not a relevant consideration in determining whether to admit evidence pursuant to *Lynch* and that it was proper for him to present evidence of Mallette's violent character through the prior convictions to support his claim that Mallette was the initial aggressor. Defendant maintains that the age of the convictions is a consideration for the jury in determining the weight of the evidence, rather than a consideration for the court in determining the admissibility of the evidence.

¶ 49    Contrary to defendant's contentions, in interpreting *Lynch*, both this court and our supreme court have implicitly recognized that remoteness in time is a valid consideration in determining whether it is reasonable for the trial court to allow the admission of evidence pursuant to *Lynch*. See, *e.g.*, *People v. Morgan*, 197 Ill. 2d 404, 455-57 (2001) (finding that the court did not err in excluding *Lynch* evidence on the grounds of remoteness of the prior conviction); *People v. Ellis*, 187 Ill. App. 3d 295, 301-02 (1989) (excluding evidence of a victim's prior convictions because the conviction occurred more than 10 years before the defendant's trial). Although defendant contends that neither *Morgan* nor *Ellis* stand for the proposition that a circuit court may consider remoteness in time in determining admissibility under *Lynch*, we decline to adopt defendant's narrow reading of these cases.

¶ 50    In *Morgan*, the supreme court noted that it failed to see how the testimony of a witness's childhood from "many years earlier" was relevant to the claim of self-defense. *Morgan*, 197 Ill. 2d at 457. Likewise, in *Ellis*, this court noted that under both *Lynch* and *People v. Montgomery*, 47 Ill. 2d 510, 516-19 (1971), "the court could have also excluded the admission of the victim's 1972 conviction because it occurred more than 10 years before the trial in this matter." *Ellis*, 187 Ill. App. 3d at 301-02. Although the court in *Ellis* was discussing the evidence under both the *Montgomery* standard, which has an explicit 10-year limitation period, and the *Lynch* standard, there is nothing in the decision to suggest that the remoteness analysis applied solely to the evidence under *Montgomery*, as defendant suggests, and not under both standards.

¶ 51        Defendant, nonetheless, relies on *People v. Gibbs*, 2016 IL App (1st) 140785, ¶ 34, where this court affirmed the trial court's decision to allow the defendant to present evidence of the victim's 14-year-old conviction for domestic violence via stipulation. The defendant in *Gibbs* sought to question the victim on cross-examination regarding the prior conviction, but the trial court required the prior conviction to be introduced via stipulation only. *Id.* In affirming the trial court's ruling, this court found that "[t]he trial court certainly could have exercised its discretion to allow limited questioning of [the victim], but given the *age of the conviction* and its factual dissimilarity to the charge in this case, it was likewise appropriate to address the matter via stipulation." (Emphasis added.) *Id.* Thus, although the court in *Gibbs* affirmed the trial court's ruling to allow admission of the evidence, the court also acknowledged that the age of the conviction was a relevant factor for the trial court to consider in determining how the evidence should have been presented at trial. The court also recognized that these considerations are within the discretion of the trial court and the trial court's ruling on these matters should not be reversed absent an abuse of that discretion. *Id.* ¶ 33 (citing *People v. Coleman*, 347 Ill. App. 3d 266, 269 (2004)). Thus, the court deferred to the trial court's discretion and affirmed its ruling based on the specific factors present in that case. We find the same deference is warranted here. See *Armstrong*, 273 Ill. App. 3d at 534.

¶ 52        Moreover, although the trial court in this case stated that its ruling was based solely on the remoteness in time, we observe that the court also could have excluded the evidence of Mallette's prior convictions because of its lack of relevance.[3] Although the evidence may have indicated that Mallette had a lack of respect for police officers or had the capacity to act insolently, it did not indicate that Mallette was physically violent toward others. There was no evidence that Mallette intentionally tried to attack the officers—the battery apparently occurred when Mallette slammed the door on the officer's hand—or anyone else or even threatened violence. There was no evidence presented regarding the "fight in progress" between Mallette and the other individual at his apartment. Thus, the proffer did not constitute reasonably reliable evidence of Mallette's violent character as required for admissibility under *Lynch*. *Lynch*, 104 Ill. 2d at 201. Accordingly, we cannot say that the trial court's decision to preclude admission of Mallette's prior convictions was so arbitrary or fanciful that it constituted an abuse of the trial court's discretion. Because we find that the court did not err in excluding this evidence, we need not address defendant's contention that the court's error was not a harmless error. See *People v. Nash*, 2012 IL App (1st) 093233, ¶ 33.

¶ 53                                    B. The Trial Judge's Bias

¶ 54        Defendant next contends that the trial judge's "antagonism and bias" toward defense counsel in front of the jury denied him a fair and impartial trial, where the case was a "credibility contest" between defendant and the State's witnesses and the trial judge's comments to defense counsel damaged defendant's credibility in the eyes of the jury. Defendant asserts that following an exchange outside of the jury's presence, the trial judge displayed antagonism toward defense counsel during defendant's testimony. Defendant

_____

[3]Although the trial court did not rely on the lack of relevance of the prior convictions in precluding defendant from introducing them as evidence, we note that we may affirm the trial court's ruling on any basis apparent from the record, regardless of whether it was relied upon by the trial court. See *People v. Gumila*, 2012 IL App (2d) 110761, ¶ 56.

- 11 -

maintains that the trial judge's "repeated[ ] berating" of defense counsel in front of the jury was highly prejudicial and suggested to the jury that defendant's testimony was not truthful.

¶ 55                                                    1. *Forfeiture*

¶ 56       Initially, we observe that defendant has forfeited this issue for review. In order to preserve an issue for appeal, defendant must specifically object at trial and raise the specific issue again in a posttrial motion. *People v. Woods*, 214 Ill. 2d 455, 470 (2005). In this case, defendant neither objected at trial, nor raised the issue in a posttrial motion. Defendant acknowledges the forfeiture, but contends that we should review this issue under plain error.

¶ 57                                                    Plain Error

¶ 58       The plain error rule allows a reviewing court to consider unpreserved claims of error regardless of forfeiture. *People v. Thompson*, 238 Ill. 2d 598, 613 (2010). Plain error applies when there is a clear or obvious error and the evidence is so closely balanced that the error would change the outcome of the case or when there is a clear or obvious error that is so serious that it affected the fairness of defendant's trial. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). Defendant contends that both prongs of the plain error analysis could apply to our review of this issue. The first consideration in addressing defendant's plain error argument is determining whether an error occurred, which requires a " ' "substantive look" ' " at the issue. *People v. Hudson*, 228 Ill. 2d 181, 191 (2008).

¶ 59                                                2. *Standard of Review*

¶ 60       Every defendant, regardless of the nature of the proof against him, is entitled to a trial that is free from improper and prejudicial comments on the part of the trial judge. *People v. Stokes*, 293 Ill. App. 3d 643, 648 (1997). Allegations of judicial bias or prejudice must be viewed in context and should be evaluated in terms of the trial judge's specific reaction to the events taking place. *People v. Jackson*, 205 Ill. 2d 247, 277 (2001). Remarks belittling defense counsel or demonstrating hostility to defense counsel may prevent the defendant from receiving a fair trial. *People v. Harris*, 123 Ill. 2d 113, 137 (1988). However, the fact that a judge displays displeasure or irritation with an attorney's behavior is not necessarily evidence of judicial bias against the defendant or his counsel. *People v. Urdiales*, 225 Ill. 2d 354, 426 (2007) (citing *Jackson*, 205 Ill. 2d at 277). "[I]n order for a trial judge's comments to constitute reversible error, a defendant must demonstrate that the comments constituted a material factor in the conviction or were such that an effect on the jury's verdict was the probable result." *Harris*, 123 Ill. 2d at 137. We review *de novo* the question of whether the trial judge's conduct requires reversal of the judgment. See *People v. McLaurin*, 235 Ill. 2d 478, 485 (2009).

¶ 61                                        3. *Discussion Before Defense Case*

¶ 62       Defendant contends that the trial judge's antagonism toward defense counsel began following a discussion held outside the jury's presence with the trial judge, defense counsel, and the State. During this discussion, which took place after the close of the State's case, defense counsel informed the trial judge that it would be calling Officer Stanley, paramedic Hansen, and defendant as witnesses. The trial judge noted that Hansen was not in court that day, but defense counsel informed the trial judge that Hansen was on "phone hold" and that he

would be at the courthouse as soon as defense counsel called him. The trial judge told defense counsel to call Hansen immediately and that defendant could testify second and Hansen last so that the court did not have to stop the trial. Defense counsel objected, stating that such a decision would violate defendant's constitutional rights to present his defense. Defense counsel stated that he would call Hansen now, and the trial judge told defense counsel to "[g]et him on the phone right now. Right now. Go in there and get him on the phone. Right now. Call him. *** I want to see how far away he is."

¶ 63　　Defense counsel then informed the trial judge that he was texting Hansen, and the trial judge told defense counsel that he was "playing games" and that he should have had Hansen at the courthouse ready to testify. After further colloquy, the trial judge asked defense counsel to make an offer of proof as to what he believed Hansen would testify. Defense counsel informed the trial judge that Hansen would testify that Mallette told him he was attacked by three men and did not mention anyone choking him or trying to snap his neck. He would further testify that Mallette seemed to be in good physical and mental condition. The following then took place:

> "THE COURT: All right, listen. [Officer Stanley is] going to testify next. If [Hansen] is here or if he calls back and he's in the building, he can go on next. If not, I'm not waiting. You can stip out the testimony. You can work out a stipulation as to what is in that report. [Defense counsel], he was here yesterday. I—
>
> [Defense Counsel]: Judge, can I—
>
> THE COURT: No, no, no, no, no. I'm talking now. Then you get to respond. I get to talk.
>
> * * *
>
> THE COURT: All of you had time to speak with [Hansen when he was at the courthouse the day before] so it wasn't—the State insisted in making him available to you. I saw you speak with him.
>
> I don't know why he's not here, but you should have called him over lunch. You just told me ten minutes ago that you hadn't called him and he was on phone hold. I cannot stop a jury. I cannot release the jury today. I cannot stop them just to bring [Hansen] in when this testimony can easily be stipped out between the parties. So for that reason, I'm not going to wait for him."

¶ 64　　The trial judge then told defense counsel that his two options were to work out a stipulation of Hansen's testimony with the State or to have defendant testify after Officer Stanley and have Hansen testify last. Defense counsel protested, stating that he preferred live witnesses on the stand and should not be "forced" to stipulate to testimony if live testimony was available. The trial judge told defense counsel that he was "holding this entire courtroom and a jury in a hostage situation." The trial judge noted that Hansen would testify consistently with the information in his report and the State was willing to stipulate to all of his testimony. The trial judge expressed her desire to keep the jury trial on schedule and have closing arguments and jury deliberations the following day. The trial judge explained how she was considering the schedule of all of the attorneys, the witnesses, and the jurors and stated that she had to make a "judgment call."

¶ 65　　The ASA then informed the trial judge that court personnel had spoken to Hansen and Hansen was "under the understanding that he was testifying [the following day.]" The trial

judge asked that ASA if she was saying that Hansen was never put on phone hold, and the ASA confirmed that Hansen thought he would be testifying the following day. The trial judge concluded the discussion by telling defense counsel that he was "lying to the court" and "playing games." The trial judge stated that "[t]he jury is going to know that this is the defense case, too, that we're stopping at the defense case. *** I'm not going to tell them. I'm not going to say a word, but smart people figure these things out." Defense counsel told the trial judge that he did not mean any disrespect, but the trial judge replied that "[y]ou are disrespectful to the Court, and you're disrespectful to every person's time in this room." The trial judge informed defense counsel that he had "caused significant damage to your reputation with me." The trial then resumed with Officer Stanley testifying for defendant. The case was continued until the following morning where Hansen testified, followed by defendant.

¶ 66                          4. *Comments During Defendant's Testimony*

¶ 67        Defendant contends that following this exchange, the trial judge displayed "antagonism and bias" toward defense counsel in the presence of the jury. Defendant identifies several statements made by the court to defense counsel during defendant's testimony, which he contends illustrate the trial judge's bias and "repeated[ ] berating" of defense counsel. Defendant presents many of these statements without context; however, as noted, allegations of judicial bias or prejudice must be viewed in context and should be evaluated in terms of the trial judge's specific reaction to the events taking place. *Jackson*, 205 Ill. 2d at 277. Accordingly, we will examine the trial judge's comments to defense counsel in light of the context in which they were said and the surrounding circumstances.

¶ 68        During defendant's testimony, the trial judge repeatedly instructed defense counsel to return to the podium while asking defendant questions and instructed defendant to speak louder so that everyone could hear him. Defense counsel requested a sidebar in which he stated that the trial judge had "displayed irritability to [defendant.]" The trial judge disagreed, stating that "I asked him to speak up because he's whispering ***. And the jury—I can see the jury straining to hear him." The trial judge further explained that she asked defense counsel to return to the podium because she believed that it helps the witness speak louder when the attorney is further away.

¶ 69        Following this sidebar, defendant specifically identifies several statements by the trial judge that he believes demonstrated the trial judge's antagonism and bias. The first instance identified by defendant occurred when defense counsel was asking defendant about his interactions with the officers in the vehicle after his arrest.

>           "[Defense Counsel]: And what else was said to you [by the officers in the police vehicle]?
>
>           THE COURT: [Defense counsel], you're not laying a proper foundation.
>
>           [Defense Counsel]: I'm sorry, Judge.
>
>           [Defense Counsel]: What was the demeanor of the officers as they were talking to you?
>
>           THE COURT: That is not foundation, ask a foundational question.
>
>           [Defense Counsel]: Who was driving the vehicle? How many officers were in the car with you?
>
>           [Defendant]: There were two officers."

- 14 -

Defendant then testified regarding the circumstances leading to him being interviewed by officers at the Schaumburg police department.

"[Defense Counsel]: Did they ask you questions?

[Defendant]: Yes

[Defense Counsel]: What were they telling you?

[Assistant State's Attorney]: Objection.

THE COURT: Sustained.

[Defense Counsel]: Did they ask you questions about your background?

[Defendant]: Yes, they did.

[Defense Counsel]: And did you tell them who you were and where you grew up?

[Defendant]: Yes, I did.

[Assistant State's Attorney]: Objection.

THE COURT: Sustained.

[Defense Counsel]: At any point in time did the officers, any of those two officers in the first interview room with you, did they ever ask you anything related to this alleged crime that occurred?

[Defendant]: Yes.

[Defense Counsel]: And what were they telling you in relation to this alleged crime that occurred on August 13, 2011?

[Assistant State's Attorney]: Objection.

THE COURT: Sustained.

[Defense Counsel]: Were they asking you if you had committed a crime on August 13, 2011?

[Defendant]: Yes.

[Assistant State's Attorney]: Objection.

THE COURT: Sustained.

[Defense Counsel]: Judge, sidebar.

THE COURT: [Defense counsel], you have to lay a foundation. Ask a proper question. Rephrase it. And go back to the podium.

* * *

[Defense Counsel]: The two officers that were talking to you, where were they seated?

[Defendant]: Well, they were seated on—one was seated across from me and one was like almost to the side at the table.

Q. Which one of the officers was talking to you?

A. Well, I don't remember which one was actually questioning me.

Q. Were both officers questioning you?

A. Yes, both officers asked me questions.

Q. And how was the demeanor of the officers as they were questioning you?

A. They seemed upset.

Q. Were you upset?

A. I wasn't really upset, no, I was really scared because they were telling me I committed a robbery and I have never been locked up before.

[Assistant State's Attorney]: Objection.

THE COURT: [Defense counsel].

[Defense Counsel]: Judge, I can't move to strike the answer.

THE COURT: No, you can't[,] but you can ask proper questions, proper direct examination questions.

[Defense Counsel]: I believe I have.

Q. Mr. Barnes, when you—when the police officers accused you of being involved in this so-called crime, did you tell them—

THE COURT: Stop for one second, I need to do this.

The jury is not to consider what this defendant answered. The objection is sustained and the jury is to disregard the last answer the witness gave."

¶ 70    Viewed in context, these comments by the trial judge do not suggest antagonism or bias by the trial judge, but rather show the trial judge's rulings on the State's objections and her repeated reminders to defense counsel to establish foundation for his questions. Laying a foundation involves "[i]ntroducing evidence of certain facts needed to render later evidence relevant, material or competent." Black's Law Dictionary (10th ed. 2014). Here, defense counsel was skipping this crucial element of defendant's testimony, and the trial judge was continually reminding him to lay a proper foundation before posing further questions. Defense counsel failed to lay a proper foundation and simply asked defendant what the officers told him while inserting the relevant information into the question rather than allowing defendant to describe the relevant information through his testimony. The State properly objected to these questions and the trial judge ruled on the State's objections, informing defense counsel that she was sustaining the State's objections because defense counsel had failed to lay a proper foundation. As this court has recognized, the court may exercise its role to control the trial, and comments made with a valid basis do not display a specific bias or prejudice against defense counsel. *People v. Garrett*, 276 Ill. App. 3d 702, 713 (1995). The same analysis applies to the other statements of the trial judge identified by defendant.

¶ 71    Defendant refers to the trial judge's comments later in his testimony admonishing defense counsel for leading defendant and for testifying for defendant. Defendant asserts that these comments were particularly damaging where they suggested to the jury that defendant was being coached through his testimony and was not testifying truthfully. Like the trial judge's other comments, however, when viewed in context, they do not show the antagonism or bias that defendant suggests. Rather, as with the previously examined comments, they show the trial judge ruling on the State's objections and informing defense counsel how to properly examine defendant as a witness on direct examination.

"[Defense Counsel]: At some point in time did you ask [*sic*] these officers that you wanted to speak to your coach?

[Assistant State's Attorney]: Objection.

THE COURT: Sustained.

[Defense Counsel]: Did you ask them—

[Assistant State's Attorney]: Objection.

THE COURT: Sustained. [Defense Counsel], this is direct examination you can't cross examine the witness.

[Defense Counsel]: I'm sorry, Judge.

THE COURT: Ask proper questions.

[Defense Counsel]: Did you tell the police officers that you wanted to talk to anyone?

[Defendant]: Yes.

[Assistant State's Attorney]: Objection.

THE COURT: All right, the answer will stand. Ask another question. But please, [Defense Counsel], you can't lead the witness.

[Defense Counsel]: Judge, I'm not leading my witness.

THE COURT: Ask him what he said if anything, please.

* * *

[Defense Counsel]: At some point in time, Mr. Barnes, did you understand that the officers [were] referring to Mr. Mallette?

[Assistant State's Attorney]: Objection.

THE COURT: Sustained. [Defense counsel], you cannot lead the witness on direct examination.

[Defense Counsel]: Sorry, Judge.

THE COURT: Please rephrase your question.

[Defense Counsel]: Thank you. At some point in time did the officers tell you who the victim was?

[Defendant]: Yes, they did."

Defendant then testified that the officers left the interview room and an ASA entered the room with a document detailing his involvement in the incident and asked defendant to sign the statement. Defendant did not agree to the contents of the document so he refused to sign it, and the ASA left the room and two other officers came into the room.

"[Defense Counsel]: When the new police officers arrived after the attorney walked out, you said you weren't sure how long had passed, did you sign some documents when they entered the room?

[Assistant State's Attorney]: Objection.

[Defendant]: No.

THE COURT: The witness said no so the answer will stand. [Defense counsel].

[Defense Counsel]: I'll round it up, Judge.

THE COURT: No, you have to ask open-ended questions, you cannot testify for your client.

[Defense Counsel]: Judge, I am not testifying for my client.

THE COURT: Please rephrase the question.

[Defense Counsel]: Judge, I'll make a record. You made a record in front of the jury.

THE COURT: Please rephrase the question.

[Defense Counsel]: I am not testifying for my client.

THE COURT: [Defense counsel], please rephrase your question.

[Defense Counsel]: Mr. Barnes.

[Defendant]: Yes, sir.

[Defense Counsel]: Did you at any point in time sign any documents?

[Defendant]: Yes, I did."

¶ 72    Despite defendant's contentions, it is clear from the record that rather than displaying "antagonism and bias" toward defense counsel, that the trial judge was ruling on the State's objections and advising defense counsel how to properly question defendant on direct examination. As the State's objections suggest and the trial judge's rulings show, defense counsel was asking defendant improper leading questions on direct examination, *i.e.*, his questions were suggesting the answer by putting into defendant's mind the words or thoughts of the answer. See *People v. Lane*, 256 Ill. App. 3d 38, 59 (1993). Generally, it is improper to lead a witness except on cross-examination (*id.* at 59-60), and we find nothing inappropriate about the trial judge's comments, which merely served to inform defense counsel of the reasons that the trial judge was sustaining the State's objections, to instruct defense counsel how to proceed to avoid further objections, or to ask him to rephrase the question to avoid impropriety. The trial judge's comments, read in context, do not suggest that the trial judge was indicating to the jury that defendant was falsifying his testimony with his counsel's assistance, as defendant suggests, but rather show the trial judge's rebuking of defense counsel after repeatedly admonishing him to not ask leading questions of defendant. As the record shows, the trial judge permitted defense counsel to proceed uninterrupted when he asked defendant proper, open-ended questions.

¶ 73    Defendant identifies a final exchange between defense counsel and the trial judge, during which defendant contends the trial judge exhibited "unprofessional sarcasm" toward defense counsel. During the State's cross-examination of defendant, defense counsel objected to the relevance of one of the State's questions. After the trial judge overruled defense counsel's objection, defense counsel stated: "Sidebar." The trial judge responded, "Judge, please, could we have a sidebar, is that what you meant to say?" The trial judge then held a sidebar after defense counsel replied, "Excuse me, Judge, I want to have a sidebar." This exchange does not represent "repeated[ ] berating" of defense counsel as defendant suggests. More importantly, defendant fails to establish how the trial judge's "comments constituted a material factor in the conviction or were such that an effect on the jury's verdict was the probable result" (*Harris*, 123 Ill. 2d at 137), where the court merely ruled on the State's objections and instructed defense counsel how to proceed to avoid further objections. This exchange between the trial judge and defense counsel does nothing to support defendant's argument in this regard.

¶ 74    We also note that although defendant does not directly contest the sufficiency of the evidence presented at trial to sustain his conviction, he repeatedly contends that the evidence at trial was closely balanced and came down to a "credibility contest" between the State's witnesses and defendant. We believe defendant far overstates the closeness of the evidence presented. Mallette's version of the incident was corroborated by the expert testimony of Dr. Schupp regarding Mallette's injuries, the testimony of Stein and Golston, defendant's statement to ASA O'Malley, the testimony of the police officers, and the physical evidence including the blood on the bottom of defendant's shoe, which matched the buccal swab taken

from Mallette. Defendant's version of the events was evidently rejected by the jury and defendant has failed to demonstrate that the court's comments to defense counsel influenced that result. *Harris*, 123 Ill. 2d at 137. We recognize the minor inconsistencies among the witnesses' testimony that defendant identifies, *i.e.*, what time the attack occurred, how many people attacked Mallette, and whether he was choked or not; however, these minor discrepancies do not create a reasonable doubt as to defendant's guilt, nor do they indicate that the evidence was closely balanced in light of the other evidence presented. *People v. Lee*, 376 Ill. App. 3d 951, 956 (2007) (citing *People v. Crespo*, 118 Ill. App. 3d 815, 819 (1983)).

¶ 75    We further find the authority relied upon by defendant in support of this contention unpersuasive. In *People v. Mitchell*, 228 Ill. App. 3d 167, 169-70 (1992), the trial judge "mock[ed]" defense counsel by commenting on his questions of the witnesses and remarking on the physical evidence presented. In addition, the trial judge displayed "direct hostility" toward the defendant during defense counsel's direct examination and interrupted the defendant's testimony to interject the judge's own opinion of the testimony. *Id.* at 170. Following the State's objection to one of defense counsel's questions of defendant, the trial judge stated that " 'it's quite obvious there was no conversation like the one you just made up.' " *Id.* This court also found that the trial judge's bias was evident through his inconsistent rulings of law. *Id.* at 171. During opening statements, the trial judge permitted the State to explain the legal standards to be applied to the evidence but repeatedly interrupted defense counsel *sua sponte* when he tried to do the same. *Id.*

¶ 76    Here, we cannot say the trial judge's conduct in this case rose to the level of the conduct found prejudicial in *Mitchell*. The trial judge here did not display hostility toward defendant, did not make inconsistent rulings of law, and did not interrupt defense counsel *sua sponte* during arguments. All of the trial judge's remarks were made either in response to the State's objections, to ask defense counsel to rephrase a question into a proper form for direct examination, or in response to defense counsel's request for a sidebar. Crucially, the court made no remarks on the evidence presented and only told defense counsel to stop testifying for defendant in an effort to prevent defense counsel from asking leading questions on direct examination. Following the court's admonishments, the court permitted defense counsel to properly elicit the testimony without comment.

¶ 77    We likewise find *Stokes*, 293 Ill. App. 3d at 648, distinguishable where in that case, the trial judge interrupted defense counsel's cross-examination of a witness and stated that the cross-examination was driving him " 'crazy.' " The judge also suggested that maybe he could do a better job than defense counsel and told the jury that they could ignore defense counsel's cross-examination of another witness: " 'I don't know where we are going. I am telling you something right now, ladies and gentlemen, when and if this is not tied up, all this stuff you can ignore.' " *Id.* The trial judge then asked defense counsel if he was going to start crying. *Id.* at 649.

¶ 78    The trial judge's comments in the case at bar are clearly distinguishable from the comments made by the trial judge in *Stokes* that this court found served to "belittle[ ]" defense counsel and suggest to the jury the judge's opinion of defense counsel and the case. *Id.* As discussed, the trial judge's comments in this case served to exercise its role to control the trial by ruling on the State's objections and direct defense counsel how to proceed. The trial judge's comments were made with a valid basis (see *Garrett*, 276 Ill. App. 3d at 713), did not suggest the trial judge's opinion of the evidence being presented, and did not display a specific bias or

prejudice against defense counsel through unwarranted comments as in the cases cited by defendant. Accordingly, we find no error warranting plain error review and honor defendant's forfeiture of this issue. See *People v. Johnson*, 238 Ill. 2d 478, 491 (2010).

¶ 79                                    C. Section 3-6-3(a)(2)(iii)

¶ 80        Defendant next contends that the trial court erred when it sentenced him to serve his consecutive sentences at 85% time, rather than 50% time, based on its finding that he caused great bodily harm to Mallette. Defendant asserts that section 3-6-3(a)(2)(iii) of the Unified Code of Corrections (Unified Code) (730 ILCS 5/3-6-3(a)(2)(iii) (West 2010)), which the trial court used to determine that he should serve his sentence at 85% time, is unconstitutional on its face following the United States Supreme Court's ruling in *Alleyne v. United States*, 570 U.S. 99, 133 S. Ct. 2151 (2013), which expanded on the Supreme Court's ruling in *Apprendi v. New Jersey*, 530 U.S. 466 (2000).[4] Defendant contends that this section is unconstitutional because it allows the trial court to use a fact in sentencing to increase his mandatory minimum sentence without submitting that element to the jury to determine that the factual predicate exists beyond a reasonable doubt.

¶ 81        In *Apprendi*, the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 490. The Court explained that the difference between an element of an offense, for which defendant has a right to a jury trial and proof beyond reasonable doubt, and a sentencing factor, which can be decided by a judge, is whether "the required finding expose[s] the defendant to a greater punishment than that authorized by the jury's guilty verdict." *Id.* at 478-79, 494. The Supreme Court expanded on *Apprendi* more than a decade later in *Alleyne*. In *Alleyne*, the Supreme Court held that "any fact that increases the mandatory *minimum* [sentence] is an 'element' [of the crime] that must be submitted to the jury [and found beyond a reasonable doubt]." (Emphasis added.) *Alleyne*, 570 U.S. at ___, 133 S. Ct. at 2155. The Court explained that the "touchstone" for determining whether a fact must be found by a jury beyond a reasonable doubt is "whether the fact constitutes an 'element' or 'ingredient' of the charged offense." *Id.* at ___, 133 S. Ct. at 2158 (Thomas, J., joined by Ginsburg, Sotomayor, and Kagan, JJ.). The Court noted, however, that not all factual findings that affect a sentence must be made by a jury:

> "Our ruling today does not mean that any fact that influences judicial discretion must be found by a jury. We have long recognized that broad sentencing discretion, informed by judicial factfinding, does not violate the Sixth Amendment. See, *e.g*, *Dillon v. United States*, [560 U.S. 817, 828-89 (2010)] ('[W]ithin established limits[,] . . . the exercise of [sentencing] discretion does not contravene the Sixth Amendment even if it is informed by judge-found facts' (emphasis deleted and internal quotation marks omitted)); *Apprendi*, [530 U.S. at 481] ('[N]othing in this history suggests that it is impermissible for judges to exercise discretion—taking into consideration various factors relating both to offense and offender—in imposing a judgment *within the range*

---

[4]Although defendant acknowledges that he forfeited this issue by failing to raise it before the trial court, we recognize that defendant may challenge the facial constitutionality of a statute at any time. *People v. Wagener*, 196 Ill. 2d 269, 279 (2001).

prescribed by statute').” (Emphasis in original.) *Id.* at ___, 133 S. Ct. at 2163 (majority op.).

¶ 82    Here, the trial court sentenced defendant to serve his consecutive 23-year term of imprisonment for home invasion and robbery at 85% under section 3-6-3(a)(2)(iii) of the Unified Code. That section is part of the “truth-in-sentencing” scheme that “the Department of Corrections uses to calculate good-conduct credit.” *People v. Salley*, 373 Ill. App. 3d 106, 109 (2007). Under the Unified Code, an incarcerated individual generally receives day-for-day good-conduct credit. 730 ILCS 5/3-6-3(a)(2.1) (West 2010). If, however, defendant is convicted of certain enumerated offenses, including home invasion, and the court finds that defendant caused “great bodily harm” to a victim in the commission of that offense, the defendant will receive “no more than 4.5 days of good conduct credit for each month of his or her sentence of imprisonment.” 730 ILCS 5/3-6-3(a)(2)(iii) (West 2010); *Salley*, 373 Ill. App. 3d at 109.

¶ 83    Defendant asserts that Section 3-6-3(a)(2)(iii) requires the trial court to determine whether defendant caused “great bodily harm” upon its own review of the evidence. Defendant contends that such a finding violates *Alleyne* because it raises the mandatory minimum sentence defendant must serve by raising the “minimum floor for a defendant from 50% time to 85% time.”

¶ 84    Although this court has not addressed the constitutionality of section 3-6-3(a)(2)(iii) in light of the Supreme Court’s ruling in *Alleyne*, we find this court’s analysis in its post-*Apprendi* precedent relevant to the issue before us. In *People v. Robinson*, 383 Ill. App. 3d 1065, 1071 (2008), this court explained that section 3-6-3 “d[id] not change the prescribed maximum penalty of the underlying offense” although we recognized that it “may well affect the sentence defendant ultimately serves.” This court concluded that the statute did not violate *Apprendi* because it did not affect the sentence imposed and that, because the statute concerns good-time credit, “its application is not definite, immediate, or automatic.” *Id.* In essence, this court has found that section 3-6-3(a)(2)(iii) does not “expose the defendant to a greater punishment than that authorized by the jury’s guilty verdict.” *Apprendi*, 530 U.S. at 494. *Robinson* and other post-*Apprendi* cases of this court have distinguished between findings of fact that impact the actual jail time a defendant must serve and those that impact the sentence imposed. See, *e.g.*, *Robinson*, 383 Ill. App. 3d at 1071; *People v. Garry*, 323 Ill. App. 3d 292, 299 (2001) (“[T]he finding of great bodily harm simply had an impact upon the amount of time by which defendant—through his own ‘good conduct’—could decrease his sentence” and did not “trigger any penalty for [the] crimes.” (Emphases omitted.)). We find that the Supreme Court’s analysis in *Alleyne* does not change our analysis with regard to section 3-6-3(a)(2)(iii). Although the finding of great bodily harm by the court may change the actual amount of jail time defendant serves, it does not increase defendant’s mandatory minimum sentence and thus does not violate *Alleyne*. Accordingly, we find that section 3-6-3(a)(2)(iii) is not unconstitutional on its face.

¶ 85                                        1. *Sixth Amendment*

¶ 86    For the same reasons, we find that the trial court’s sentence did not violate defendant’s sixth amendment rights to due process or a trial by jury. The fourteenth amendment right to due process and the sixth amendment right to a trial by jury, “[t]aken together, *** indisputably entitle a criminal defendant to ‘a jury determination that he is guilty of every

- 21 -

element of the crime with which he is charged, beyond a reasonable doubt.' " *Apprendi*, 530 U.S. at 476-77 (quoting *United States v. Gaudin*, 515 U.S. 506, 510 (1995)). Defendant contends that, although he failed to preserve this issue for review, we should review this issue under the plain error doctrine, or, in the alternative, because his counsel was ineffective for failing to preserve the issue for appeal. Defendant contends that he suffered prejudice where the cause and extent of Mallette's injuries were contested at trial. We disagree.

¶ 87    As discussed, the court's finding that defendant caused great bodily harm was not an element of the offense but rather was a sentencing element. We further recognize that the court's finding was supported by the record, particularly Dr. Schupp's testimony that Mallette had fractured ribs, fractures to his spine, a collapsed lung, fractured thyroid cartilage, and the imprint of the bottom of a shoe on his face. Dr. Schupp testified that Mallette's version of the events was consistent with the injuries he exhibited, and Sergeant Klebba and Hansen both testified that Mallette was in obvious pain when they arrived at the scene of the incident. Defendant did not present any evidence to contest the extent of Mallette's injuries but merely relies on the testimony of Hansen and Officer Stanley that defendant did not mention to them that he had been choked. This was insufficient to rebut the trial court's finding that defendant caused great bodily harm to Mallette. Accordingly, we find no error warranting plain error review and honor defendant's forfeiture of this issue. See *Johnson*, 238 Ill. 2d at 491. We likewise find defendant's claim of ineffective assistance of counsel unavailing. "[I]f the ineffective-assistance claim can be disposed of on the ground that the defendant did not suffer prejudice, a court need not decide whether counsel's performance was constitutionally deficient." *People v. Evans*, 186 Ill. 2d 83, 94 (1999). Prejudice occurs where defendant demonstrates a reasonable probability that, but for counsel's deficient performance, the outcome of the proceedings would have been different. *People v. Richardson*, 189 Ill. 2d 401, 411 (2000). As discussed, we find that the trial court did not err in finding that defendant caused great bodily harm, and we therefore find no prejudice as a result of defense counsel's alleged deficient performance.

¶ 88                                    D. Excessive Sentence

¶ 89    Lastly, defendant contends that his sentence is excessive in light of his young age, lack of criminal history, family background, and other factors that demonstrate his potential for rehabilitation. Defendant asserts that the court improperly focused on one "most significant" factor in aggravation and one in mitigation in determining his sentence, ignoring the remaining mitigating factors presented. Defendant maintains that, given these mitigating factors, the minimum term of imprisonment allowable by statute was appropriate in this case and the court erred by sentencing him to a term of 23 years' imprisonment.

¶ 90                                    1. *Standard of Review*

¶ 91    A reviewing court will not alter a defendant's sentence absent an abuse of discretion by the trial court. *People v. Alexander*, 239 Ill. 2d 205, 212 (2010). A trial court abuses its discretion in determining a sentence where the sentence is greatly at variance with the spirit and purpose of the law or if it is manifestly disproportionate to the nature of the offense. *Id.* The trial court is afforded such deference because it is in a better position than the reviewing court to weigh the relevant sentencing factors such as " 'defendant's credibility, demeanor, general moral character, mentality, social environment, and age.' " *People v. Stevens*, 324 Ill. App. 3d 1084,

1093-94 (2001) (quoting *People v. Streit*, 142 Ill. 2d 13, 19 (1991)). In the absence of evidence to the contrary, we presume that the sentencing court considered all mitigating evidence presented. *People v. Gordon*, 2016 IL App (1st) 134004, ¶ 51.

¶ 92                                                2. *Defendant's Sentence*

¶ 93        Here, defendant was found guilty of robbery (720 ILCS 5/18-1(a) (West 2010)) and home invasion (720 5/12-11(a)(2) (West 2010) (renumbered as 720 ILCS 5/19-6(a)(2) by Pub. Act 97-1108 (eff. Jan. 1, 2013))). Robbery is a Class 2 felony, which carries a sentencing range of three to seven years' imprisonment (730 ILCS 5/5-4.5-35(a) (West 2010)). Defendant was eligible for Class X sentencing for his conviction for home invasion because he intentionally caused injury in the commission of the offense (720 5/12-11(a)(2), (c) (West 2010) (renumbered as 720 ILCS 5/19-6(a)(2), (c) by Pub. Act 97-1108 (eff. Jan. 1, 2013))), which carries a sentencing range of 6 to 30 years' imprisonment (730 ILCS 5/5-4.5-25(a) (West 2010)). The court sentenced defendant to consecutive terms of imprisonment of 5 years for robbery and 18 years for home invasion. Thus, the sentence imposed fell within the statutorily prescribed range.

¶ 94        Defendant contends, however, that the court abused its discretion in determining his sentence by considering only the "most significant" factors in mitigation and aggravation instead of considering all statutory factors. The record shows that in announcing defendant's sentence, the court stated that "one of the most significant" factors in aggravation was the injuries to Mallette and that defendant's lack of criminal background was "the significant factor" in mitigation. Defendant construes this explanation by the court to indicate the court considered *only* these factors in determining defendant's sentence and ignored the other factors presented in mitigation and aggravation. The record shows, however, that the court also stated that it had "reviewe*d all* the statutory factors in aggravation and mitigation." (Emphasis added.).

¶ 95        The record shows that during the sentencing hearing, defense counsel identified the same mitigating factors defendant brings to our attention on appeal, including defendant's youth, lack of criminal background, and rehabilitative potential. It is not our function to independently reweigh these factors and substitute our judgment for that of the trial court. *Alexander*, 239 Ill. 2d at 214-15. Although the trial court did not specifically identify which factors it considered in determining defendant's sentence, we observe that a trial court is not required to specify on the record the reasons for the sentence imposed (*People v. Acevedo*, 275 Ill. App. 3d 420, 426 (1995)) nor is it required to recite and assign value to each factor presented at the sentencing hearing (*People v. Baker*, 241 Ill. App. 3d 495, 499 (1993)). Rather, it is presumed that the trial court properly considered all mitigating factors and rehabilitative potential before it, and the burden is on defendant to affirmatively show the contrary. *People v. Brazziel*, 406 Ill. App. 3d 412, 434 (2010). Here, defendant has failed to do so. Although we are cognizant of Justice Hyman's concurring opinion in *People v. Bryant*, 2016 IL App (1st) 140421, ¶ 26 (Hyman, J., specially concurring), which is cited by defendant and calls into question the practice of trial courts not stating on the record the basis for their sentencing decision, it does not change our well-established precedent.

¶ 96        We further find defendant's reliance on *Miller v. Alabama*, 567 U.S. 460 (2012), *Graham v. Florida*, 560 U.S. 48 (2010), and *Roper v. Simmons*, 543 U.S. 551 (2005), unpersuasive. This line of Supreme Court cases has recognized the special characteristics of juvenile

offenders, including their lack of maturity, underdeveloped brains, and rehabilitative potential, and requires sentencing courts to consider these factors in sentencing. See *Roper*, 543 U.S. at 569; *Graham*, 560 U.S. at 68; *Miller*, 567 U.S. at 471. Defendant contends that under this precedent, the trial court did not adequately consider defendant's age, 19 years old at the time of the incident, in sentencing him to a term of imprisonment of 23 years.

¶ 97 Our supreme court has repeatedly held, however, that the rationale of *Miller*, *Roper*, and *Graham* applies "only in the context of the most severe of all criminal penalties," namely capital punishment, natural life imprisonment, or *de facto* life imprisonment. *People v. Patterson*, 2014 IL 115102, ¶ 110; see also *People v. Reyes*, 2016 IL 119271, ¶ 9 (holding that under *Miller*, *Roper*, and *Graham*, a juvenile offender's eighth amendment rights are violated where the juvenile is sentenced to a mandatory term of imprisonment that has the functional equivalent of life in prison without the possibility of parole). Here, defendant did not receive "the most severe of all criminal penalties." His 23-year sentence does not amount to a *de facto* life sentence, and as such the rationale of *Miller*, *Roper*, and *Graham* does not apply to his sentence. Even if defendant's sentence were considered a *de facto* life sentence, this court has declined to apply the rationale of *Miller*, *Roper*, and *Graham*, where, as here, defendant is an adult, *i.e.*, over the age of 18. See *People v. Thomas*, 2017 IL App (1st) 142557, ¶¶ 26-28. Accordingly, we find no abuse of discretion where the sentence imposed was within the prescribed statutory range, does not greatly vary from the purpose of the law, and is not manifestly disproportionate to the nature of the offense. *Brazziel*, 406 Ill. App. 3d at 433-34 (citing *People v. Stacey*, 193 Ill. 2d 203, 210 (2000)).

¶ 98                                               III. CONCLUSION

¶ 99 For the reasons stated, we affirm the judgment of the circuit court of Cook County.

¶ 100 Affirmed.