2020 IL App (1st) 170602-U

No. 1-17-0602

Third Division

May 20, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 10 CR 14680 |
| | ) | |
| TERRY ANDERSON, | ) | Honorables |
| | ) | Tommy Brewer and |
| Defendant-Appellant. | ) | Luciano Panici, |
| | ) | Judges, presiding. |

JUSTICE COBBS delivered the judgment of the court.
Presiding Justice Ellis and Justice Howse concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant's conviction and sentence for first-degree murder are affirmed where he did not receive ineffective assistance of counsel, the State did not commit prosecutorial misconduct in closing arguments, and the trial court did not err during *voir dire*, in making evidentiary rulings, or in imposing a sentence.

¶ 2    Following a jury trial, defendant Terry Anderson was convicted of first-degree murder and sentenced to 65 years in prison. He now appeals, arguing that (1) the trial court erred by denying his motion to introduce evidence of the victim's violent propensities, (2) he was deprived of a fair

and impartial jury by a comment the court made during *voir dire*, (3) his counsel was ineffective for failing to seek the suppression of a post-arrest statement to police, (4) his counsel was ineffective for failing to tender an accomplice-witness jury instruction, (5) the State made improper remarks during closing argument, and (6) his sentence was excessive. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4      Defendant was initially charged in a 17-count indictment with first-degree murder, aggravated unlawful use of a weapon, and unlawful use of a weapon by a felon. The charges arose from the fatal shooting of Maurice Lawton, which occurred in Ford Heights, Illinois on July 16, 2010. The State proceeded on just two counts of first-degree murder.

¶ 5      Prior to trial, the defense filed a motion to quash arrest and suppress evidence, arguing that defendant was arrested without probable cause. In boilerplate language, the motion requested the suppression of, among other things, "[p]hysical evidence discovered directly and indirectly as a result of the arrest and detention," "[w]itnesses who viewed [defendant] during the detention following the arrest," and "[s]tatements, utterances, reports of gestures and responses by [defendant] during the detention following the arrest."

¶ 6      At a hearing on the motion, Cook County Sheriff's sergeant Michael Dwyer and Cook County Sheriff's detective David Tuzim testified that they were patrolling Ford Heights on the night of the shooting when they heard two gunshots at approximately 8:50 p.m. They drove toward a convenience store near where they believed the shots originated. A man in the parking lot gestured toward the housing projects behind the store and said, "Those noises coming from back there." The officers drove in that direction and spotted defendant running "frantic[ally]" out of an

alley near the footpath between the convenience store and the housing projects. Defendant looked at the officers but did not stop running. The officers pursued defendant, but briefly lost sight of him when he ran around an abandoned building at the intersection of Route 30 and Ellis Avenue. Defendant emerged from the other side of the building and continued to run for a "short distance." He then stopped "abruptly" and began walking with another individual, later identified as Romanus Ubamadu. The officers stopped defendant and Ubamadu and patted them down for weapons. As the officers did so, they received a call of a "man down" by the housing projects. After receiving the call, the officers handcuffed defendant and Ubamadu and walked them back to their squad car. As defendant was being placed in the squad car, he stated, "I ran because I had weed." The "man down" was later determined to be Lawton.

¶ 7     The trial court found that the officers lacked probable cause for the arrest. Noting that "[t]here was nothing specific in the motion," the court asked defense counsel if there were "any specific items that [she] wanted suppressed." In response, counsel requested that the results from post-arrest lineups and a gunshot residue test be excluded. The court ruled that "those items should be suppressed."

¶ 8     The State filed a motion to reconsider the legality of the arrest, or alternatively, for the court to find that the evidence was attenuated from the arrest. At the hearing on the motion, the State provided testimony from other Cook County Sheriff's officers establishing that defendant was identified by eyewitnesses at the scene shortly after the shooting and that a revolver that "definitely appeared that it wasn't there for a long time at all" was recovered from the roof of the abandoned building where Dwyer and Tuzim lost sight of defendant during the chase. The court declined to reconsider its ruling on the propriety of defendant's arrest, but found that the lineups

and gunshot residue test were attenuated because the additional evidence "gave [the police] probable cause to remove the purge of the illegality of the initial arrest." Consequently, the lineups and gunshot residue test were admissible. The court denied defendant's motion to reconsider its attenuation ruling.

¶ 9    Defendant also filed a pretrial "MOTION FOR INTRODUCTION OF THE VICTIM'S VIOLENT CHARACTER" pursuant to *People v. Lynch*, 104 Ill. 2d 194 (1984). Specifically, the defense sought to introduce evidence that (1) defendant knew Lawton to carry a firearm, (2) defendant saw Lawton shoot a firearm into an occupied building in December 2006, (3) Lawton was convicted of aggravated battery against a police officer in 2009, and (4) Lawton was convicted of aggravating fleeing or attempting to elude a police officer in 2004. In response, the State contended that Lawton's convictions were not indicative of a violent character because one was a "traffic offense" and the other involved spitting on a police officer rather than causing bodily harm. The State also argued that evidence of Lawton's alleged use of a firearm was "vague, speculative, and uncertain" because it was not corroborated in any way.

¶ 10    The court denied defendant's motion with respect to Lawton's prior convictions. Noting that defendant's allegation about the 2006 incident was " a self-serving statement" with "nothing to prove here this in fact even happened," the court further ruled that the defense could not introduce the alleged incident unless it offered "anything else to back it up." When defense counsel continued to argue that some of the witnesses may testify that Lawton was known to carry a firearm, the court responded that it would reconsider its ruling if any of the witnesses so testified.

¶ 11    The State also moved to introduce "eyewitness accounts indicating that the victim and defendant argued over the sale of drugs at the defendant's drug spot," contending that such

evidence was relevant to defendant's motive and intent. In response, the defense suggested that the area be referred to only as a "drug spot or a location" because there were no police reports indicating that the area was "specifically just the defendant's drug spot." The court ruled that the State would not mention "defendant's drug spot" in its opening statement, but would be allowed refer to it as such if a witness testified that it was defendant's spot.

¶ 12    The case proceeded to *voir dire*, where the court admonished the prospective jurors, *inter alia*, that they (1) should be "absolutely candid and honest in all of your responses to all questions," (2) did not have "any reason to be afraid of anything or anyone in this courtroom," and (3) could choose to answer privately if the answer to any question was embarrassing. The court then asked each member of the venire whether they could evaluate the evidence without sympathy, bias, or prejudice. When one prospective juror indicated that he could not, the following exchange took place:

> "THE COURT: You can't?
> [PROSPECTIVE JUROR]: Yes.
> THE COURT: Go ahead.
> [PROSPECTIVE JUROR]: Judge, unfortunately, I was a policeman for almost 30 years. I have been retired for 11.
> THE COURT: Okay.
> [PROSPECTIVE JUROR]: Now, I believe you said this happened in 2010?
> THE COURT: Yes.
> [PROSPECTIVE JUROR]: Okay. A good friend of mine from high school and college was an ET with the county. Not one of the ones on this case, however, he did work in that unit and back in 2010 he might have been still on. I'm not sure.
> Also based on that just from my past experience, I almost immediately was getting ready to give my verdict and unfortunately—
> THE COURT: About what? There is no evidence being presented.
> [PROSPECTIVE JUROR]: Judge—
> THE COURT: Let me explain something to you. As a police officer, you are a disgrace. Do you know that?
> [PROSPECTIVE JUROR]: Judge, well, Judge—

THE COURT: No, you can't add nothing. You are excused. Get out of here before I get mad."

*Voir dire* then continued and the jury was selected from the members of the venire who vowed to remain impartial.

¶ 13    At trial, Tuzim testified consistently with his suppression hearing testimony. Specifically, he stated that he and Dwyer were patrolling on the night of the shooting when they heard two gunshots by the housing projects at around 9 p.m. As they drove past a nearby convenience store, a man in the parking lot indicated that the shots came from the housing projects. Dwyer drove in that direction and the officers saw defendant running "frantically" from an alleyway behind the projects. Defendant moved his right hand as he ran, but kept his left hand "stationary down by his waist area." The officers pursued defendant and did not lose sight of him until he ran around the north side of an abandoned building near the intersection of Route 30 and Ellis Avenue. Defendant emerged from the other side of the building "a few seconds" later, and the officers exited their vehicle to pursue on foot. By the time the officers caught up to defendant, he was walking with Ubamadu. Ubamadu was not with defendant earlier in the chase. The officers took defendant and Ubamadu back to their squad car, patted them down, and placed them in handcuffs. As defendant was put in the back of the squad car, he stated, "I ran because I had weed." No drugs or firearms were recovered from defendant.

¶ 14    Around that time, Tuzim and Dwyer received a radio transmission about a "man down" by the housing projects, near where they first observed defendant running. Tuzim and another officer, Joseph Chirillo, retraced defendant's steps in search of a weapon, but did not find one on the ground. After calling the fire department for a ladder, they searched the roof of the abandoned building and recovered a revolver in "pristine condition" from the northwest corner. Evidence

technician Allan Morrison arrived and inventoried the weapon, which Tuzim identified in court. Tuzim testified that he remained in the vicinity of the abandoned building during the entire search for weapons and did not see anyone other than law enforcement approach the building during that time.

¶ 15    Morrison testified that he arrived on the scene and recovered the firearm just after 9 p.m. He discovered two live rounds and two spent shell casings in the cylinder. Morrison also swabbed defendant's and Ubamadu's hands for gunshot residue.

¶ 16    Forensic scientist Mary Wong testified that she examined the gunshot residue kits completed by Morrison. The testing revealed gunshot residue on defendant's left hand, but none on Ubamadu's hands. Wong also tested Ubamadu's clothing for gunshot residue and the results were negative.

¶ 17    Dr. Ponni Arunkumar, the Chief Medical Examiner in the Cook County Medical Examiner's Office, testified about Lawton's autopsy, which was conducted on the day after the shooting by another doctor who no longer worked for the county. After reviewing that doctor's reports and photographs, Arunkumar concluded that Lawton's death was a homicide caused by two gunshot wounds to his shoulder and chest. Based on a lack of soot or stippling, Arunkumar opined that the shots were fired from more than two feet away. She also noted that Lawton's blood alcohol concentration was 0.167 at the time of his death, or "more than twice the legal driving limit."

¶ 18    Forensic scientist Caryn Tucker testified as an expert in the field of firearm identification. After examining the firearms evidence, Tucker determined that the bullets recovered from Lawton's body were fired by the gun recovered from the roof of the abandoned building.

¶ 19     Ubamadu testified that he grew up in Ford Heights with Lawton, whom he considered "to be like family." He was also "cool" with defendant. On the night of the shooting, Ubamadu was visiting his sister in the housing projects. He was drinking and smoking marijuana with Lawton, defendant, and others when Lawton and defendant got into an argument that ended with defendant shooting Lawton. Ubamadu initially testified that he did not remember what the argument was about, but was allowed to refresh his recollection through a videotaped statement he gave to police in the days after the shooting. Ubamadu then recalled that Lawton stated that he was "finna sell his drugs," and that defendant replied that Lawton "wasn't gone sell shit." After several minutes of yelling, Lawton "swung on [defendant] a couple of times," but did not make contact. Defendant responded by shooting Lawton twice.

¶ 20     Defendant and the others ran away once Lawton fell to the ground. Ubamadu initially stood there "in shock," but then walked away toward Ellis Avenue. He saw police in the parking lot of the convenience store and defendant running through an alley in the housing projects. Defendant ran around the abandoned building and then approached Ubamadu. The police arrested them both moments later. Ubamadu admitted that he initially told an assistant state's attorney that he did not remember what happened because they were within earshot of other detainees at the time and "y'all know how this street stuff go." He decided to tell the truth about the shooting once he learned that Lawton had died.

¶ 21     Sean Watson, who was 12 years old at the time of the shooting, testified that he was with a cousin and a friend on the night in question, but denied recalling the shooting because "a lot of shootings go on in Ford Heights." He knew an individual by the nickname "T.D.," but did not see T.D. in the courtroom. Watson acknowledged speaking to police about Lawton's shooting, but

denied that the conversation took place at his friend's grandmother's house. He also stated that he did not remember speaking to an assistant state's attorney or viewing lineups at the Cook County Sheriff's Department on the day after the shooting. When presented with a handwritten statement from that date, Watson acknowledged that his signature appeared on the bottom of each page but continued to deny recalling that he gave the statement. Watson also acknowledged testifying before a grand jury, but did not remember any of the questions he was asked or any of the answers he gave. He denied stating that he saw defendant running away from police while holding a gun or that defendant threw the gun as he ran.

¶ 22 Assistant State's Attorney Lynnette Cusack testified that she adduced Watson's grand jury testimony. She identified a copy of the transcript from that testimony, which the State published over defense counsel's objection. According to the transcript, Watson stated that he was at a party with his friend and his cousin on the night of the shooting. He and the friend left the party to go to a store. As they were walking to the store, Watson saw defendant and Ubamadu, whom he repeatedly referred to by the nicknames "T.D." and "Bud," respectively, running from the police. Defendant was holding a firearm, which he eventually threw into the yard of John Bell, who lived next to the abandoned building. Defendant and Ubamadu then surrendered to the officers who were chasing them.

¶ 23 Assistant State's Attorney Catherine Malloy testified that she spoke to Watson on the day after the shooting. Malloy memorialized the interview in a handwritten statement, which Watson reviewed, made minor corrections to, and signed on each page. The handwritten statement, which was also introduced into evidence, is consistent with Watson's grand jury testimony except that it does not mention that defendant threw his gun into Bell's yard.

¶ 24    Cook County Sheriff's detective Ronald Russell testified that he administered two different physical lineups that Watson viewed on the day after the shooting. In one lineup, Watson identified defendant as the man he saw "running from the police and as he was running from the police he threw a gun into the yard of John Bell next to a burnt building." In the second lineup, Watson identified Ubamadu as the other man he saw running from police on the night of the shooting.

¶ 25    The State rested, and the defense moved for a directed verdict, which was denied. The defense then rested without presenting evidence.

¶ 26    At the jury instruction conference, the court asked defense counsel whether the defense had any objection to the State's proposed instruction regarding statements made by a defendant. Counsel responded that "there's no evidence that the defendant made a statement in this matter at all." The State clarified that the proposed instruction referred to defendant's statement that, "I ran because I had weed." Counsel replied "that's not as to this charge. He made no statement as to this charge." The State agreed to withdraw the proposed instruction in light of counsel's response.

¶ 27    Prior to closing arguments, the court admonished the jury that, "As I already stated, what the lawyers say is not evidence and should not be considered by you as evidence. The lawyers will simply be discussing what they believe the evidence has shown."

¶ 28    During its closing argument, the State contended that Lawton and defendant got into "an argument about business, business with major profits at stake." The court overruled defense counsel's objection, stating that, "Each attorney may comment on the evidence and any reasonable inferences therefrom. What the lawyers say again I want to remind you is not evidence." The State continued that the argument was "about narcotics sales *** specifically the control over narcotics

sales at that housing project," and that "defendant didn't want to hear that" Lawton was planning on sell drugs there.

¶ 29    In arguing that the offense should not be mitigated to second-degree murder, the State remarked that "[t]here are absolutely no circumstances that would have led the defendant to believe he needed to use deadly force" because "[y]ou don't respond to a drunken swing and a miss by two shots to the chest." Rather, the State contended that "defendant was not acting out of fear or his need for protection," but "out of greed and anger" and "fear of losing his money and his power and his control over that location."

¶ 30    The State also argued that defendant tried to avoid responsibility for Lawton's murder by running from the police after the shooting. In particular, the State opined that defendant's claim that he ran because he "had weed" was contradicted by the fact that the police did not recover any drugs from the area despite a search for the murder weapon.

¶ 31    Finally, the State contended that both Watson and Ubamadu were influenced by a "code of silence." Specifically, the State noted that Watson's assertions that he did not remember anything about the shooting or his previous statements was "a bunch of baloney, and you know that it is because the day after the murder when [he] was 12 years of age before he was influenced by the code of silence from the streets, he told the Assistant State's Attorney what he saw that night." The State also maintained that Ubamadu's demeanor on the witness stand was indicative of his reluctance to testify in violation of the "code of silence," but that Ubamadu "decided to do the right thing" when he learned of Lawton's death.

¶ 32    In response, the defense attacked the credibility of various witnesses and argued that Ubamadu was actually the shooter. The defense also addressed the State's theory that defendant

fought with Lawton over drug sales, emphasizing that none of the witnesses testified that defendant was selling drugs on the day of the shooting and that no drugs were recovered from the crime scene.

¶ 33    After deliberation, the jury found defendant guilty of first-degree murder. Defendant's motion for a new trial was denied.

¶ 34    The case proceeded to a sentencing hearing, where the court acknowledged receipt of the presentence investigation report. In aggravation, the State emphasized the nature of the offense, which it characterized as "an execution of a victim over nonsense" that occurred in the presence of several children. The State also argued that defendant "solves his problems with guns," noting that one of defendant's two prior felony convictions was for the reckless discharge of a firearm. The State further introduced victim impact statements from Lawton's brother, son, and the mother of Lawton's son, which the court described as "very moving."

¶ 35    In mitigation, defense counsel argued that Lawton, who was drunk and not known for "upstanding behavior," was the aggressor in the argument while defendant was just "standing there holding a conversation." Counsel also mentioned that defendant had disavowed his gang membership and "had made some changes" to be a better father to his five children.

¶ 36    Defendant declined to make a statement in allocution.

¶ 37    The trial court sentenced defendant to a total of 65 years in prison—40 years for the murder with a mandatory 25-year enhancement for personally discharging a firearm during the offense. This appeal followed.

¶ 38                                  II. ANALYSIS

¶ 39                                A. *Lynch* Motion

¶ 40    On appeal, defendant first argues that the trial court erred by refusing to allow him to introduce evidence of Lawton's violent character. Specifically, defendant contends that the court "gutted" his ability to raise self-defense and thus deprived him of a fair trial when it excluded evidence that (1) he knew Lawton to carry a gun, including during the incident in which Lawton allegedly fired into an occupied building, and (2) Lawton had two prior felony convictions. According to defendant, such evidence was admissible pursuant to *People v. Lynch*, 104 Ill. 2d 194 (1984).

¶ 41    As a preliminary matter, the parties disagree about the proper standard of review. The State contends that the trial court's decision should be reviewed for abuse of discretion. Defendant acknowledges that a court's evidentiary rulings are generally reviewed for abuse of discretion, but, citing *U.S. v. Pineda-Doval*, 614 F. 3d 1019 (9th Cir. 2010), contends that "whether that decision denied the defendant his right to present a complete defense is reviewed *de novo*." However, *Pineda-Doval* is from a foreign jurisdiction and is therefore not binding on this court. *People v. Coleman*, 2014 IL App (5th) 110274, ¶ 146. Moreover, this court has consistently reviewed a trial court's denial of a *Lynch* motion for abuse of discretion. See, *e.g.*, *People v. Barnes*, 2017 IL App (1st) 143902, ¶ 40; *People v. Bowman*, 2012 IL App (1st) 102010, ¶ 31; *People v. Cook*, 352 Ill. App. 3d 108, 127 (2004). This court has also stated that "when a party claims he was denied his constitutional right to present a complete defense due to improper evidentiary rulings, the standard of review is abuse of discretion." *People v. Burgess*, 2015 IL App (1st) 130657, ¶ 133. Consequently, we will review the trial court's denial of defendant's *Lynch* motion for abuse of discretion, which occurs only where a ruling is so arbitrary, fanciful, or unreasonable that no reasonable person could agree with it. *Bowman*, 2012 IL App (1st) 102010, ¶ 31.

¶ 42     In *Lynch*, our supreme court held that "reasonably reliable" evidence of a victim's violent character is admissible in two scenarios. *Lynch*, 104 Ill. 2d at 200-01. First, if the defendant knew of the victim's violent character or prior violent acts at the time of the offense, such evidence may be offered to show that the defendant reasonably believed the use of force was justified. *Id.* at 199-200. Second, where there are conflicting accounts of how the events in question transpired, the defendant may introduce evidence of the victim's violent character to support the claim that the victim was the initial aggressor. *Id.*

¶ 43     Although defendant contends that evidence of Lawton's prior convictions should have been admissible to show that Lawton was the aggressor, there was no dispute that Lawton threw the first punches. See *People v. Jackson*, 293 Ill. App. 3d 1009, 1014 (1997) ("*Lynch* evidence may be properly excluded where, as here, there was no conflict concerning who was the aggressor."). Indeed, the testimony of Ubamadu, the only witness who testified to the substance of the argument between defendant and Lawton, established that the argument turned physical when Lawton "swung on [defendant] a couple of times" without making contact. There was no testimony to suggest that this did not occur or that defendant attempted to strike Lawton first. As such, evidence of Lawton's convictions was unnecessary and not admissible to prove he was the initial aggressor.

¶ 44     Moreover, Lawton's prior convictions were also not *Lynch* material because they did not indicate that he had a violent character. To be admissible under *Lynch*, a conviction must be probative of the victim's propensity for violence. *Cook*, 352 Ill. App. 3d at 127. A conviction for a nonviolent offense is not relevant. *Id.* Here, Lawton's previous convictions were for (1) aggravated fleeing or attempting to elude a police officer and (2) aggravated battery against a police officer. Although defense counsel proffered that Lawton caused "an accident" while

attempting to evade police, we cannot say that the trial court abused its discretion in finding that conviction not indicative of a violent character. Additionally, while battery is usually probative of a person's violent character (*Lynch*, 104 Ill. 2d at 203), Lawton's battery conviction did not stem from causing bodily harm to a police offer, but for spitting on one. Under these circumstances, it was reasonable for the trial court to determine that Lawton's particular battery conviction was not relevant to his violent character. See *Barnes*, 2017 IL App (1st) 143902, ¶¶ 45, 52 (the victim's convictions for resisting arrest and battery based on closing a door on an officer's hand "may have indicated that [the victim] had a lack of respect for police officers or had the capacity to act insolently, [but] did not indicate that [the victim] was physically violent toward others"). Accordingly, the trial court did not abuse its discretion in excluding evidence of Lawton's prior convictions.

¶ 45    Defendant similarly contends that the trial court erred by excluding evidence that he knew Lawton to carry a firearm and to have once fired into an occupied building. However, the record shows that the court did not categorically bar this evidence as irrelevant, but rather conditioned its admissibility on whether defendant could offer some modicum of corroboration. Indeed, the court made clear that it would allow evidence of Lawton's gun habits if defendant could produce a witness to testify that Lawton had carried a gun in the past. Apparently unable to do so, defendant abandoned his theory of self-defense and decided to argue that he was not the shooter. While defendant correctly observes that his personal knowledge of Lawton's character is a threshold requirement for admissibly under *Lynch*, he ignores the fact that "*Lynch* and its progeny unquestionably hold that proof is needed that the victim committed the crimes." *Cook*, 352 Ill. App. 3d at 128. A trial court may reject even relevant *Lynch* evidence if it is "remote, uncertain,

or speculative." *People v. Figueroa*, 381 Ill. App. 3d 828, 840-41 (2008). Here, the unreliability of the challenged evidence is underscored by the fact that defendant could produce nothing to corroborate his contention that Lawton had carried a gun in the past. The trial court therefore did not abuse its discretion in excluding such evidence.

¶ 46     We also note that, contrary to what defendant claims on appeal, the court's ruling did not deprive him of his ability to raise self-defense at trial. Again, defendant would likely have been free to introduce evidence of Lawton's gun habits if he was able to show it was reliable. Moreover, nothing in the court's ruling prevented defendant from testifying that he felt threatened by Lawton or that he shot Lawton out of his fear for his own safety. Although defendant contends that it "would have been forbiddingly risky" for him to testify because the State would have impeached his credibility with his prior felony convictions, this has nothing to do with the court's ruling on his proposed *Lynch* evidence. Defendant does not challenge the admissibility of his own convictions on appeal. Thus, the trial court did not abuse its discretion in ruling on defendant's *Lynch* motion and did not deprive defendant of the ability to raise self-defense.

¶ 47                                   B. Motion to Suppress

¶ 48     Defendant next argues that his defense counsel was ineffective for "failing to take advantage" of the court's ruling on his pretrial motion to quash arrest and suppress evidence. In particular, defendant observes that counsel successfully litigated the motion and (temporarily) obtained the exclusion of the lineup identifications and gunshot residue test, but did not request the suppression of defendant's statement that he "ran because [he] had weed."

¶ 49     Claims of ineffective assistance of counsel are evaluated under the two-part test announced by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v.*

*Miramontes*, 2018 IL App (1st) 160410, ¶ 13. To prevail on an ineffective assistance claim, a defendant must show both that his counsel's performance fell below an objective standard of reasonableness and that there is a "reasonable probability" that the result of the proceeding would have been different but for counsel's errors. *People v. Short*, 2020 IL App (1st) 162168, ¶ 83. A "reasonable probability" is one sufficient to undermine confidence in the outcome of the trial. *People v. Peterson*, 2017 IL 120331, ¶ 79.

¶ 50    Here, counsel's decision not to request the exclusion of defendant's statement is akin to a decision not to file a motion to suppress at all. A counsel's decision on whether to file a motion to suppress is generally a matter of trial strategy and not subject to a claim of ineffective assistance of counsel. *People v. Brickhouse*, 2018 IL App (3d) 150807, ¶ 40. A defendant raising such a claim " 'must overcome the strong presumption that the challenged action or inaction of counsel was the product of sound trial strategy and not of incompetence.' " *People v. Campos*, 2019 IL App (1st) 152613, ¶ 46 (quoting *People v. Coleman*, 183 Ill. 2d 366, 397 (1998)). This presumption is not overcome merely because a strategy proved unsuccessful. *People v. Tucker*, 2017 IL App (5th) 130576, ¶ 54. Rather, counsel's strategic choices amount to ineffective assistance only when they "appear irrational and unreasonable in light of the circumstances that defense counsel confronted at the time." *People v. Faulkner*, 292 Ill. App. 3d 391, 382 (1997).

¶ 51    Defendant argues that his counsel's decision not to seek the suppression of his statement was irrational and prejudicial because, as no drugs were recovered from the area or his person, the statement "made [him] look like a liar at a particularly crucial time." However, defendant has done nothing to overcome the strong presumption that counsel's decision was a matter of sound trial strategy. Although defendant asserts that "no possible trial strategy existed" for counsel's decision,

we note that the statement is actually exculpatory on its face. While defendant suggests that counsel might have simply forgotten about the statement, counsel's remarks at the jury instruction conference demonstrate that she believed the statement was not necessarily incriminating, at least with respect to the murder. Moreover, the fact that no drugs were found on defendant did not necessarily render his statement unbelievable. Indeed, the evidence that was apparently credited by the jury showed that defendant discarded contraband in the form of a firearm as he ran. While the police recovered only the firearm from the surrounding area, we note that the officers were responding to a call of shots fired and that Tuzim testified that he was "looking for a possible weapon," not drugs. We therefore must presume that counsel's decision not to seek the suppression of defendant's statement was a matter of reasonable trial strategy.

¶ 52 Even assuming, *arguendo*, that counsel's performance was deficient, defendant cannot show that he was prejudiced by the admission of the statement. Ubamadu, the only eyewitness to the actual shooting, testified that defendant shot Lawton twice after an argument. Officers responded to the call of shots fired and observed defendant running away from the crime scene. Defendant did not stop once he saw the police chasing him. The officers only briefly lost sight of defendant during the pursuit when he ran around an abandoned building. Further, according to Watson's grand jury testimony, Watson saw defendant toss a firearm while he was next to the abandoned building. The police recovered a firearm on the roof of that building, and forensic testing determined that it was the murder weapon. Gunshot residue was also found on defendant's left hand, which was the hand Tuzim observed him hold at his waistband as he fled from police. Thus, the evidence against defendant was substantial, and there is no reasonable probability that

the inclusion of his statement affected the outcome of his trial. Counsel was therefore not ineffective for failing to challenge the statement.

¶ 53                                    C. Accomplice-Witness Instruction

¶ 54    Defendant further argues that counsel was ineffective for failing to tender the pattern jury instruction regarding accomplice-witness testimony with respect to Ubamadu. That instruction provides:

> "When a witness says he was involved in the commission of a crime with the defendant, the testimony of that witness is subject to suspicion and should be considered by you with caution. It should be carefully examined in light of the other evidence in the case."

> Illinois Pattern Jury Instructions, Criminal, No. 3.17 (4th ed. 2000)

¶ 55    The failure to tender this instruction can constitute deficient performance. See *People v. Hunt*, 2016 IL App (2d) 140786, ¶ 53. However, the instruction is properly given only where the evidence and reasonable inferences drawn therefrom give rise to probable cause that a witness "participated in the planning or commission of the crime." *People v. Caffey*, 205 Ill. 2d 52, 116 (2001). The test for determining whether a witness is an accomplice is whether the witness could have been indicted for the charged offense himself. *People v. Lewis*, 240 Ill. App. 3d 463, 466-67 (1992). A person who is merely present at the scene or acquiesces to a criminal act is not an accomplice. *People v. Zombrano*, 2016 IL App (3d) 140178, ¶ 26. While courts typically find no strategic reasons for failing to tender accomplice-witness instruction when applicable (*People v. Davis*, 353 Ill. App. 3d 790, 795 (2004)), counsel is not ineffective for failing to make a futile request for an inapplicable jury instruction (*People v. Douglas*, 362 Ill. App. 3d 65, 73 (2005)).

¶ 56    We begin our analysis by noting that the plain language of the pattern instruction in question states that it applies "[w]hen a witness says he was involved in the commission of a crime with the defendant." Here, Ubamadu did not in any way suggest that he was involved in the offense apart from his mere presence at the crime scene. Although our supreme court has stated that the instruction may be given in circumstances where a witness denies participation in the crime, there still must be probable cause to believe that the witness was involved. See *Caffey*, 205 Ill. 2d at 116. Defendant contends that probable cause existed here because Ubamadu was at the scene, fled, was arrested alongside defendant, and was treated as a suspect in custody until he told police that defendant was the shooter. However, the evidence only corroborated Ubamadu's testimony that he was a mere bystander at the scene and contradicted defendant's position that Ubamadu was an active participant. First, as noted, Ubamadu testified that he considered Lawton "to be like family" and there was no testimony that he was involved in the argument between defendant and Lawton before the shooting. Second, defendant, not Ubamadu, was the only man who tested positive for gunshot residue and who was seen running with a firearm and abandoning a firearm near where the murder weapon was found. While defendant observes that Ubamadu fled the scene after the shooting, we note that, unlike defendant, he did not continue to flee once confronted by the police. Thus, the evidence did not show that Ubamadu was an accomplice, and counsel was therefore not deficient for failing to tender an accomplice-witness instruction.

¶ 57    In any event, defendant is also unable to show that he was prejudiced by the lack of an accomplice-witness instruction. In *People v. McCallister*, 193 Ill. 2d 63, 90 (2000), our supreme court identified three factors relevant to determining whether a defendant was prejudiced by his counsel's failure to tender an accomplice-witness instruction: (1) the "inherent weaknesses of [the]

defendant's own testimony," (2) the strength of the evidence apart from the alleged accomplice's testimony, and (3) the instructions actually received by the jury. Here, as defendant did not testify, the first *McCallister* factor is inapplicable. However, defendant's version of events—namely his trial theory that Ubamadu was the real shooter—has "inherent weaknesses" in that defendant, not Ubamadu, was the only man who tested positive for gunshot residue and was seen discarding a firearm as he ran past where the murder weapon was found. Thus, the evidence independent of Ubamadu's testimony strongly suggested that defendant was the man who shot Lawton. Moreover, while not sufficient alone, the fact that the jury was instructed to consider each witness's interests, biases, and prejudices when making credibility determinations makes the omission of an accomplice-witness instruction less prejudicial. See *McCallister*, 193 Ill. 2d at 97. Finally, we note that the jury was made well aware of any potential issues with Ubamadu's testimony, as defense counsel extensively attacked his credibility during closing argument and contended that he gave false testimony in order to deflect suspicion from himself. See *Hunt*, 2016 IL App (2d) 140786, ¶ 62 (no prejudice where, among other things, accomplice-witness's plea deal with the State was highlighted in the defense's opening statement and closing argument). Under these circumstances, defendant cannot establish that his counsel was ineffective for failing to tender an accomplice-witness instruction.

¶ 58                                    D. Right to an Impartial Jury

¶ 59     We next consider defendant's argument that the trial court "interfered" with the jury selection process and thus deprived him of his right to a fair and impartial jury. Defendant maintains that the trial judge "nullified his own ability to guarantee then that there were no jurors who were biased against [defendant] but afraid to speak up" when the judge stated that one

prospective juror—a former police officer who indicated that he could not be impartial and had reached a verdict before hearing any evidence—was "a disgrace."

¶ 60    As an initial matter, defendant acknowledges that he did not object to the statement and has thus forfeited the issue for review. However, defendant contends that we should relax the forfeiture rules because preserving the issue would have required his counsel to object to the trial court's conduct. Alternatively, defendant asks us to review the issue under the plain error doctrine or as a matter of ineffective assistance of counsel. Because we find that the trial court did not err, we would reach the same result under any of these theories.

¶ 61    The purpose of *voir dire* is to select a panel of impartial jurors who are free from bias or prejudice. *People v. Terrell*, 185 Ill. 2d 467, 484 (1998). The trial court has discretion to control the scope and manner of *voir dire*. *People v. Morales*, 2012 IL App (1st) 101911, ¶ 56. A court abuses that discretion only where its conduct "thwarted the selection of an impartial jury." *People v. Williams*, 164 Ill. 2d 1, 16 (1994).

¶ 62    In support of his position that the court's comments to one prospective juror chilled the candidness of other members of the venire, defendant relies on *People v. Brown*, 388 Ill. App. 3d 1 (2009). However, *Brown* is distinguishable and in fact undermines defendant's argument that a new trial is required. There, a prospective juror in a drug case indicated that they could not be fair and impartial because they had family members who had been affected by illegal drug use. *Id.* at 2-3. The court excused the prospective juror from service, but ordered them to return to court the next day to observe the rest of *voir dire* and receive "an education as to how the system works." *Id.* at 3.

¶ 63    On appeal, this court first rejected the defendant's argument that the normal forfeiture rules should be relaxed, and instead analyzed the issue for plain error. *Id.* at 5, 10. Although we recognized that comments tending to reduce the venire's willingness to answer honestly "should be avoided," we ultimately concluded that the defendant was not deprived of a fair trial because (1) his claim that prospective jurors might have been chilled was "grounded on nothing more than speculation," (2) defense counsel was allowed to question the remaining venire members to "ferret out actual bias," and (3) the requirement that the dismissed prospective juror return the next day did not rise to the level of the "penalty" assessed in *U.S. v. Rowe*, 106 F. 3d 1226, 1228 (5th Cir. 1997), where the trial court told a dismissed venire member that she would serve three months of jury duty to "see if [she] can figure out how to put aside [her] personal opinions and do [her] duty to [her] country as a citizen." *Id.* at 5, 9-10.

¶ 64    Although defense counsel here did not question the members of the venire, we find that defendant's claims of a chilling effect amount to nothing more than pure speculation. See *Morales*, 2012 IL App (1st) 101911, ¶ 59 (following *Brown* and finding no plain error where the trial court threatened a prospective juror with a month of jury duty after she expressed a bias against street gangs). This is especially so because the court admonished the venire that they should not hesitate to answer candidly and could answer in private if they wished. Additionally, while defendant characterizes the court's conduct as "a threat *and* a punishment" (emphasis in original) and "more extreme" than that in *Brown*, the opposite is true. Whereas the trial court in *Brown* imposed a clear punishment by requiring the dismissed juror to return the following day, the court here merely dismissed the prospective juror with no requirement to return. We reject defendant's argument that requiring the dismissed venire member to "walk out of the courtroom on their own under everyone

else's watchful eyes" constituted an impermissible "punishment" that deprived him of a fair trial. This is a far cry from the three months of jury duty threatened in *Rowe*. In short, while the trial court's use of the word "disgrace" was unnecessary and perhaps imprudent, it was not reversible error.

¶ 65                                    E. Closing Argument

¶ 66    Defendant next argues that he was deprived of a fair trial by the State's "repeated misstatements of facts" during closing argument. In particular, defendant challenges two categories of statements: (1) that defendant's motive for killing Lawton was a dispute over drug territory and (2) that Watson and Ubamadu were reluctant to testify truthfully because of a "code of silence from the streets." The State maintains that the challenged remarks were properly based on the evidence and reasonable inferences drawn therefrom.

¶ 67    Initially, defendant acknowledges that he has largely forfeited this issue by failing to object to any of the State's comments except for one that claimed "major profits [were] at stake." Even so, defendant asks us to review the matter under either prong of the plain error doctrine or for ineffective assistance based on counsel's failure to preserve the issue.

¶ 68    The plain error doctrine is a "narrow and limited exception" to the general forfeiture rule that allows a reviewing court to consider an unpreserved issue where a "clear or obvious error occurred" and either (1) the evidence was closely balanced such that the error threatened to tip the scales of justice or (2) the error was so egregious as to deny the defendant a fair trial and implicate the integrity of the judicial process. *People v. Reese*, 2017 IL 120011, ¶¶ 60, 72. Under either prong of the doctrine, the first step is to determine whether a "clear or obvious" error occurred. *Id.* ¶ 60. Similarly, a defendant cannot prevail on a claim of ineffective assistance of counsel unless

he shows that counsel failed to raise a clearly meritorious objection. *People v. Henderson*, 2016 IL App (1st) 142259, ¶ 197.

¶ 69　A defendant faces a "substantial burden" when seeking to obtain the reversal of his conviction based upon remarks made during closing argument, especially where, as here, the issue was not preserved. *People v. Carbajal*, 2013 IL App (2d) 111018, ¶ 39. The State is afforded "wide latitude" during closing argument and may comment on the evidence and any reasonable inferences drawn therefrom. *People v. Donahue*, 2014 IL App (1st) 120163, ¶ 115. Moreover, even improper comments during closing argument warrant reversal only if they "engender[ed] substantial prejudice against a defendant such that it is impossible to say whether or not a verdict of guilt resulted from them." *People v. Wheeler*, 226 Ill. 2d 92, 123 (2007).

¶ 70　Here, defendant argues that the State impermissibly argued facts not in evidence through comments that there were "major profits at stake" and that defendant acted out of "greed and anger" and "fear of losing his money and his power and his control over that location." According to defendant, these remarks were improper because there was "not a scintilla of evidence" that he was involved in selling drugs. However, Ubamadu's testimony established that the argument that led to Lawton's death began because defendant objected to Lawton's plan to sell drugs at that location. Although defendant opines that it was "just as likely" from that testimony that he did not want drugs being sold in that area at all, the State is allowed to comment on *all* reasonable inferences from the evidence, even if they reflect negatively on a defendant. *People v. Nicholas*, 218 Ill. 2d 104, 121 (2005).

¶ 71　Defendant similarly contends that the State argued facts not in evidence by claiming that Ubamadu and Watson were reluctant to incriminate defendant because of a "code of silence."

However, although Ubamadu did not use the words "code of silence," he explained that he initially falsely told police that he did not remember what happened because "y'all know how this street stuff go." It was only after he learned that Lawton, his lifelong friend, had succumbed to his gunshot wounds that he decided to tell police what he knew. As for Watson, we acknowledge that he did not explain why he was less than forthcoming at trial other than that he could not remember any of the events of the shooting, his interviews with police and prosecutors, or his grand jury testimony. While defendant suggests that Watson, who was 12 years old at the time of the shooting and 19 years old at the time of trial, genuinely could not remember, neither the State nor the jury was required to accept this somewhat incredible account. Indeed, as the State indicated at closing argument, a more natural explanation was that Watson no longer wished to incriminate defendant. Thus, the States remarks about Ubamadu's and Watson's reluctance to testify honestly constituted fair inferences from the evidence.

¶ 72    Furthermore, defendant cannot show that the State's remarks were a material factor in his conviction. As we have previously explained, there was compelling evidence that defendant fired the fatal shots, including the gunshot residue on his hand and the eyewitnesses who saw him shoot Lawton, run from the police, and attempt to hide the murder weapon. And, as defendant concedes on appeal, he did not offer any evidence of self-defense. Additionally, the record shows that the trial court repeatedly admonished the jurors that closing arguments were not evidence and that they should draw their conclusions based solely on the evidence. See *People v. Garcia*, 231 Ill. App. 3d 460, 469 (1992) ("[A]n instruction that closing arguments are not evidence and that any statement during arguments that is not based on the evidence should be disregarded tends to cure

any prejudice from improper remarks."). Accordingly, we find that it is not "impossible to say whether or not a verdict of guilt resulted from" the challenged remarks.

¶ 73                                    F. Excessive Sentence

¶ 74    Finally, defendant argues that his 65-year sentence was excessive because it is "unquestionably a life sentence and leaves no possibility for rehabilitation." He opines that, while a 45-year minimum sentence would be "more than adequate to protect society" and would give him "only a small chance" of ever being released from prison, the sentence the trial court imposed leaves "virtually no chance that he will survive that long." Defendant therefore asks us to reduce his sentence to the 45-year minimum, or, alternatively, to remand for a new sentencing hearing.

¶ 75    The Illinois Constitution requires that all sentences be determined according to both the seriousness of the offense and the objective of restoring the offender to useful citizenship. Ill. Const. 1970, art. I, § 11*; People v. Rizzo*, 2016 IL 118599, ¶ 28. A trial court has "broad discretionary powers" in determining a defendant's sentence, and its decision are entitled to great deference. *People v. Alexander*, 239 Ill. 2d 205, 212 (2010). A reviewing court must not substitute its judgement for that of the trial court merely because it would have weighed the relevant sentencing factors differently. *People v. Streit*, 142 Ill. 2d 13, 19 (1991). Moreover, a sentence that falls within the statutory range is presumed proper and will not be disturbed absent an abuse of discretion. *People v. Charleston*, 2018 IL App (1st) 161323, ¶ 16. A trial court abuses its discretion where it imposes a sentence that is greatly at variance with the spirit and purpose of the law or is manifestly disproportionate to the nature of the offense. *People v. Alexander*, 239 Ill. 2d 205, 212 (2010).

¶ 76    The sentencing range for first-degree murder is 20 to 60 years in prison. 730 ILCS 5/5-4.5-20 (West 2016). Here, defendant was also subject to a mandatory 25-year enhancement for personally discharging a firearm during the offense, making the applicable range anywhere from 45 to 85 years in prison. 730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2016). Accordingly, defendant's 65-year sentence fell well within the statutory range, and is thus presumed proper. Defendant acknowledges that his sentence was within the applicable range, but argues that the sentence is excessive because it "leaves no possibility for rehabilitation," as he is likely to die before he is eligible for release. However, the Illinois Constitution does not forbid a lengthy sentence for first degree murder, even where the defendant has little chance of surviving long enough to complete it. See, *e.g.*, *People v. Thomas*, 2017 IL App (1st) 142557, ¶ 48 (affirming an 80 year-sentence); *People v. Ybarra*, 2016 IL App (1st) 142407, ¶ 33 (affirming a natural life sentence); *People v. Decatur*, 2015 IL App (1st) 130231, ¶ 16 (affirming an 105-year sentence). Nor was the trial court required to ignore the seriousness of the offense, which is the most important sentencing factor. *People v. Wilson*, 2016 IL App (1st) 141063, ¶ 11. As the trial court noted, defendant murdered Lawton over an argument by discharging a firearm at around 9 p.m. on a summer night while children were present on the street. The record also shows that the court thoroughly considered the factors in aggravation and mitigation. Consequently, the court did not abuse its discretion by imposing a sentence within the statutory range.

¶ 77                                        III. CONCLUSION

¶ 78    For the foregoing reasons, defendant's conviction and sentence for first degree murder is affirmed.

¶ 79    Affirmed.