2025 IL App (1st) 240667-U
No. 1-24-0667

SIXTH DIVISION
November 14, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of Cook County, Illinois. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 22 CR 9319 (01) |
| | ) | |
| MARTINEZ OWENS, | ) | |
| | ) | The Honorable |
| Defendant-Appellant. | ) | Alfredo Maldonado, |
| | ) | Judge Presiding. |

_____

JUSTICE PUCINSKI delivered the judgment of the court.
Justices Hyman and Gamrath concurred in the judgment.

**ORDER**

¶ 1    *Held:* Defendant's convictions for attempted robbery and aggravated battery of a transit passenger are affirmed where (1) the State presented sufficient evidence to support the convictions, (2) the trial court did not abuse its discretion in denying defendant's pretrial motion seeking to admit evidence regarding the victim's prior domestic battery arrest, and (3) defendant's trial counsel was not ineffective for failing to introduce evidence regarding the victim's violent character at trial.

¶ 2    Following a jury trial, defendant Martinez Owens was found guilty of one count each of attempted robbery (720 ILCS 5/18-1(a)(West 2022); *id*. § 8-4(a) (West 2022)) and aggravated battery of a transit passenger (*id*. § 12-3.05(d)(7) (West 2022)), and was sentenced to concurrent terms of 4 ½ years' imprisonment. On appeal, defendant contends that the State failed to prove

him guilty beyond a reasonable doubt because video footage contradicted the victim's testimony, and his testimony was also inconsistent regarding defendant's actions. Defendant additionally argues that the trial court erred in denying his pretrial motion seeking to admit evidence regarding an incident of domestic battery between the victim and a former romantic partner, as it was relevant to establish the victim's violent and aggressive character under *People v. Lynch*, 104 Ill. 2d 194 (1984). Further, defendant contends that defense counsel was ineffective in failing to present evidence, which the court found admissible under *Lynch*, establishing that the victim had thrown a glass bottle at a neighbor and slapped an Uber driver, as counsel's failure to present this evidence weakened defendant's claim of self defense. For the following reasons, we affirm.

¶ 3                                                    I. BACKGROUND

¶ 4         Defendant was charged by indictment with one count of attempted robbery (720 ILCS 5/18-1(a)(West 2022); *id*. § 8-4(a) (West 2022)), two counts of aggravated battery of a transit passenger (*id*. § 12-3.05(d)(7) (West 2022)), and one count of unlawful restraint (*id*. § 10-3(a) (West 2022)). The charges arose from events on July 22, 2022, wherein defendant allegedly used force to demand that Daniel Beam, a transit passenger, give defendant his cellular telephone, and struck Beam during the incident.

¶ 5                                                 A. Pretrial Motions

¶ 6         Defendant was indicted with codefendants Larone Williams and Vernon Holman. Upon defendant's motion, his case was severed from theirs; accordingly, they are not parties to this appeal.[1]

_____

[1] Two other codefendants, Shawn Gullens and Latoya Thomas, were also charged with offenses stemming from the same July 22, 2022, incident. Their cases were not resolved pursuant to the joint and severed jury trial at issue, and they are not parties to this appeal.

¶ 7        On May 16, 2023, defense counsel filed a motion *in limine* seeking to admit evidence of Beam's violent character. In the motion, defense counsel contended that defendant might assert the affirmative defense of use of force in defense of a person at trial. Thus, counsel sought to admit four incidents allegedly demonstrating that Beam was the initial aggressor during the incident. Defense counsel sought to introduce the following incidents, each of which resulted in Beam's arrest: (1) on September 4, 2005, Beam was "combative and belligerent" with police officers; (2) on July 19, 2014, Beam spit on and slapped his Uber driver; (3) on February 2, 2015, Beam "choked and scratched his then-boyfriend"; and (4) on October 23, 2019, Beam threw items at a man and bruised him. No exhibits were attached to the motion in the record, although police reports related to the incidents were tendered to the court and the State during the hearing.

¶ 8        The matter proceeded to a hearing on June 14, 2023.[2] In his argument, defense counsel asserted that he possessed police reports and contact information for the witnesses regarding the incidents in the motion. Counsel contended that, although the incident at bar was recorded, it was possible that the jury could conclude that Beam was the initial aggressor and defendant acted in self defense. Thus, defense counsel sought to offer the incidents as evidence establishing Beam's violent character at trial. In response, the State argued that the evidence "very clearly" establishes that defendant and an unknown co-offender were the initial aggressors and Beam acted in self defense, so the motion should be denied outright. In rebuttal, defense counsel asserted that he intended to call the Uber driver at issue and one police officer related to the September 4, 2005, incident. The court questioned defense counsel about details related to the incidents. Defense counsel contended that in the October 23, 2019, incident, Beam threw "two plastic bottles, one

---

[2] Defendants Williams and Holman also filed motions pursuant to *Lynch*, which were argued the same day.

bicycle seat and one glass bottle" from a second-floor window at a neighbor, whom he did not know, while the neighbor was mowing his lawn. Regarding the July 19, 2014, incident, Beam was drinking alcohol as a passenger in an Uber vehicle, and the driver told him to stop. When they arrived at Beam's destination, Beam spat in the Uber and slapped the driver with an open hand. On February 2, 2015, Beam choked his former boyfriend, causing a scratch on the left side of the victim's neck. In an earlier incident, Beam punched the victim in the face.

¶ 9    The court granted defense counsel's motion with respect to the July 19, 2014, and October 23, 2019, incidents, and denied the motion with respect to the other two events. It first found a question of fact as to the initial aggressor in the incident, and so defendant would be entitled to use evidence regarding Beam's violent character at trial. The court then found that the incidents with the Uber driver and Beam's neighbor involved victims unknown to Beam. It denied defendant's motion with respect to the other two incidents, however, where the February 2, 2015, domestic battery involved a person with whom Beam was in a dating relationship, and the 2005 incident was "a little remote" in time. The court acknowledged that the February 2, 2015, domestic battery showed Beam's "violent tendencies," but resulted from a different situation than the case at bar. The court noted that the other crimes evidence would only be admissible if they could call the Uber driver and the neighbor as live witnesses, and stated that "[i]t doesn't come in through police reports." It noted that "[i]f you can, you can [and] [i]f you can't, you can't."

¶ 10                              B. Jury Trial and Sentencing

¶ 11    The matter proceeded to a joint and severed jury trial which began on December 6, 2023. With regard to the attempted robbery charge, the State proceeded under a theory of accountability. Beam testified that on July 22, 2022, at approximately 1:45 a.m., he was riding the Chicago Transit Authority (CTA) Red Line train home south from the north side of Chicago. The train arrived at

the Belmont station, and Beam noticed a large group of individuals gathered on the train platform and hoped they did not enter his car because they were loud. Most of the group entered the train car adjacent to Beam's, but a few members of the group entered Beam's car. One of those people, whom Beam did not know, walked up to him, "was like, hey, what's up," and bumped knuckles with Beam. Beam testified that he believed the man "seemed friendly enough." The rest of the group that entered Beam's car walked through the car, entered the next train car, and "conglomerated" with the rest of the group that Beam saw at the Belmont platform. Beam did not recognize any of the group.

¶ 12        Beam was sitting with his phone in his hand, and he was looking at it. The train proceeded to the Fullerton stop, and afterward, Beam heard the doors between the two train cars open. Two men approached him, one of whom was wearing a black balaclava. The other man, whom Beam identified in court as defendant, walked by Beam, and "eyeballed [Beam's] possession's." Then, the man wearing the balaclava attempted to "grab" Beam's phone from his hand. Beam struggled with the man momentarily, and defendant joined the struggle. Both men attacked Beam and tried to take his phone from him, and one of them stated something to the effect of "give us your s*** or we're going to f*** you up." The person wearing the balaclava grabbed Beam around the neck and choked him. Beam "used that force," stood on one of the train seats, and jumped toward them. They continued to struggle for another 20 to 30 seconds, with the men "swinging" at Beam and trying to take his phone.

¶ 13        One of the men "threw" Beam down to the ground and he dropped his phone. When Beam tried to pick it up, the person in the balaclava kicked his face. Beam was "stunned" and knew that the situation "had gotten very serious." Around this time, other people entered the train car. Beam then drew a small, fixed blade knife, with a 2.1-inch blade, from his pocket and stabbed defendant,

who was the person closest to him. Beam testified that he stabbed defendant because other people had entered the train car and approached him, and defendant was "still within striking distance." Beam knew that the situation was "serious," and he needed to defend himself. After Beam stabbed defendant, defendant and the other people returned to the other train car. Beam then "retreated" in the opposite direction to another train car. After the incident, Beam turned over his knife to the police, and he identified the knife in court.

¶ 14    Since the incident, Beam reviewed a CTA surveillance video documenting the incident and identified the video. The State published a portion of the video in open court, and Beam narrated it. It shows four angles of Beam's train car. The video is in the record on appeal and has been viewed by this court. It does not contain sound.

¶ 15    The video shows the inside of the CTA train car where Beam was sitting on July 22, 2022. The car has two external doors, which open onto the train platforms, and two internal doors connecting the train car to other cars. It is comprised of parallel rows of seats which face the external doors, and pairs of front facing seats.

¶ 16    Beam identified himself in the footage sitting on a seat in a parallel row facing the external door, positioned near the internal door connecting two train cars. Defendant, who is not wearing a shirt, enters the train from the platform through the doors facing Beam. At the same time, two other people enter the train car from the platform through the other doors. Defendant approaches Beam, "fist bumps" him, and appears to say something to him. Defendant then takes a couple steps toward the other people, who are moving toward him. He then turns and moves through the internal doors to another train car. Another woman enters the train from the platform and moves in the same direction. The other two people move with the woman through the same internal doors into

the next car. Another man also enters the car from the platform and moves into the next train car through the same internal doors.

¶ 17    A couple minutes later, after the next train stop, defendant returns through the same internal door wearing a gray hooded sweatshirt with the hood raised. He is followed directly by a man wearing a black t-shirt and balaclava. Defendant passes Beam, looks at Beam as he passes, and stands near the external doors. The man in black stops by Beam, reaches down, and attempts to take an item from Beam, which Beam testified was his phone. They struggle over it, and defendant walks back and stands next to the man in black over Beam. The man in black begins choking Beam, which pulls Beam from his seat and pins him against the window of the train car. Beam is now standing on the seats, being held against the window by his throat. Defendant then stands near them, and attempts to grab onto Beam, but has difficulty due to Beam's continued struggles against the man in black. Beam pushes against the men, and moves off the seats and onto the aisle. Defendant then attempts to move his body between the two men, grabs Beam and throws him to the ground. At this point, two other men enter the train car through the same set of internal doors from the adjacent car.

¶ 18    When Beam is on the ground, the man in black kicks Beam in the face. The other men stand with defendant and the man in black two or three feet from Beam. The group turns and moves back to the internal doors to return to their original car. Defendant is positioned closest to Beam as they move away. Beam moves toward defendant and stabs his back. Defendant then rushes through the door between the train cars. Beam turns and walks through the opposite internal doors to the next car. Beam testified that he was scared for his life, because he was outnumbered and the men had just attempted to rob him.

¶ 19    On cross-examination, Beam stated that he stabbed defendant in the back with his knife. Beam acknowledged that defendant began turning around and moving away from Beam when Beam approached defendant and stabbed him. Beam also acknowledged that nothing physically stopped him from walking backward on the train at that moment, but he did not know whether the men would attack him again. Beam, rather, "chose to try to eliminate the threat directly in front of" him "within striking distance." Beam acknowledged that he did not call the police, despite still having his phone.

¶ 20    Beam stated that he knew that the CTA had cameras which would record the incident, but was not worried that he would get in trouble with law enforcement because he was "defending himself from a violent robbery." Beam was asked about his statement to police officers at the hospital after the incident, and stated that "[m]aybe" he told them that defendant punched his head with a closed fist. Beam did not recall telling the detectives that defendant punched his body with a closed fist. Beam did not know who punched or hit him during the attack. After viewing the video, Beam did not agree that this statement was false as the video was unclear as to how defendant made contact with Beam, but he stated that he did not see defendant make a closed fist. The defense attorney also confronted Beam with a statement where he told police officers that the following sequence happened: Beam produced a knife during the incident, the offenders returned to their original train car, and then the offenders returned to Beam's train car. Beam acknowledged that he may have "misremembered" the events. Beam also identifies a moment in the video where defendant attempted to take his phone out of his hand.

¶ 21    Beam stated that the man in black initiated the attack and kicked him in the face, but noted that he did not stab him. Beam stabbed defendant because he was "closest" to him and, thus, the "greatest threat" after he was kicked in the face.

¶ 22    On redirect examination, Beam testified that the footage showed "the worst possible angle" where a viewer cannot even tell that he was kicked in the face or where defendant's arms were during the incident. Beam remembered defendant placing his hands on him, and having his hands near Beam's phone at some point after the man in black attempted to grab it. Both defendant and the man in black attacked Beam, and the stabbing occurred after both men attacked him and the man in black kicked him in the face. Prior to that moment, Beam was not holding his knife. Beam had never interacted with either man, nor threatened defendant or the man in black.

¶ 23    Chicago police detective Anthony Gracia testified that as part of his investigation of the incident, he traveled to the North and Clybourn Red Line train station where he observed a blue shirt with blood on it, and a red stain on the mezzanine level just inside the turnstile of the station. Gracia traveled to the train platform, where he saw "lots of blood on the floor, [and] on the walls," and a broken glass bottle and knife sheath on the ground. Gracia entered the train car, which was still at the platform, and saw that several train cars appeared to have "red stains, suspect blood throughout them." Gracia later reviewed CTA surveillance footage, wherein he observed defendant, who was already in police custody.

¶ 24    On cross-examination, Gracia stated that at 1:48 p.m. on July 22, 2022, he saw defendant in a holding cell at the 18th District police station. Defendant was wearing a hospital gown, and Gracia was aware that he was injured. Defendant had been transported from Northwestern Memorial Hospital to the police station, but Gracia did not speak with any hospital staff about injuries that defendant may have sustained.

¶ 25    The State entered a stipulation that, in relevant part, on July 22, 2022, the CTA Red Line train at issue was equipped with surveillance video cameras which were in proper working order. The recorded video was downloaded by CTA employees and saved to disks, which were sent to

Detective Gracia, and inventoried according with Chicago police policies. These disks contained videos which truly and accurately depicted the events at bar on the CTA Red Line cars.

¶ 26    Detective Daniel Casasanto testified for the defense that on July 22, 2022, he spoke with Beam at Northwestern Memorial Hospital at approximately 5 a.m. Beam told Casasanto that defendant punched him on his head and body with closed fists. Beam also informed Casasanto that he produced a knife from his pocket to defend himself, the offenders returned to their original train car, and then came back with another man wearing a white t-shirt.

¶ 27    Defense counsel entered a stipulation that if called, Chicago Fire Department Emergency Medical Technician Michael Harvey would testify that on July 22, 2022, he was dispatched to the North and Clybourn Red Line stop where he saw defendant lying on the sidewalk and bleeding due to a puncture stab wound in his back. Harvey gave defendant emergency medical attention at the scene to treat the wound, secured him to a medical cot, and transported him to Northwestern Memorial Hospital where he transferred defendant to the Northwestern medical trauma team.

¶ 28    The jury found defendant guilty of attempted robbery and aggravated battery.

¶ 29    Defense counsel filed a motion and amended motion for a new trial, arguing, *inter alia*, that the State failed to prove him guilty beyond a reasonable doubt, where it failed to establish that defendant aided the man in black in trying to rob Beam. Defense counsel argued that the video did not show defendant attempting to take Beam's phone, nor whether defendant and the man in black knew one another. Further, the evidence did not establish that defendant committed an aggravated battery where he attempted to stop a physical altercation between Beam and the man in black and Beam subsequently stabbed him. Defense counsel further contended that the court erred in denying defendant's *Lynch* motion with regard to the 2005 and 2015 incidents, which illustrated Beam's violent character.

¶ 30    The court denied the motion, commenting that it did not believe that error occurred during the ruling on the *Lynch* motion, and that the State established sufficient evidence to prove attempted robbery and aggravated battery, as well as to support their theory of accountability.

¶ 31    The matter proceeded to a sentencing hearing where the court sentenced defendant to concurrent sentences of 4 ½ years' imprisonment for the two counts. In sentencing defendant it acknowledged that the victim "was a difficult person to deal with during the trial and his answers at time were very evasive," but defendant was correctly found guilty under a theory of accountability "in starting the whole chain of events." It noted the victim's "role" but found that defendant was the "driving factor and cause" of the situation. It denied defense counsel's subsequent motion to reconsider the sentence.

¶ 32                                    II. ANALYSIS

¶ 33    On appeal, defendant first argues that the State presented insufficient evidence to establish his guilt beyond a reasonable doubt because the video footage contradicted the victim's testimony, and the victim testified inconsistently regarding defendant's involvement in the incident.

¶ 34                          A. Sufficiency of the Evidence

¶ 35    The standard of review for a challenge to the sufficiency of the evidence is "whether, viewing the evidence in the light most favorable to the State, 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *People v. Belknap*, 2014 IL 117094, ¶ 67 (quoting *People v. Collins*, 106 Ill. 2d 237, 261 (1985)). This standard applies whether the evidence is direct or circumstantial. *People v. Wheeler*, 226 Ill. 2d 92, 114 (2007). The trier of fact, here the jury, is responsible for resolving conflicts in the testimony, weighing the evidence, and drawing reasonable inferences from basic facts to ultimate facts. *People v. Brown*, 2013 IL 114196, ¶ 48. The reviewing court must allow all reasonable inferences from the record

in favor of the prosecution (*People v. Cunningham*, 212 Ill. 2d 274, 280 (2004)) and will not reverse a conviction unless the evidence is "unreasonable, improbable, or so unsatisfactory as to justify a reasonable doubt of the defendant's guilt" (*People v. Jackson*, 232 Ill. 2d 246, 281 (2009)).

¶ 36    Defendant was found guilty of attempted robbery under a theory of accountability, and aggravated battery of a transit passenger. A person commits robbery "when he or she knowingly takes property" from another person "by the use of force or by threatening the imminent use of force." *People v. Profit*, 2021 IL App (1st) 170744, ¶ 23; 720 ILCS 5/18-1(a)(West 2022). For the State to prove attempted robbery, it must establish that the person "does any act that constitutes a substantial step toward the commission of" robbery. *Profit*, 2021 IL App (1st) 170744, ¶ 23; 720 ILCS 5/8-4(a) (West 2022). A person commits aggravated battery of a transit passenger when he or she causes bodily harm or makes physical contact of an insulting and provoking nature to a person whom he knows to be a transit passenger. 720 ILCS 5/12-3.05(d)(7) (West 2022); *id*. § 12-3(a) (West 2022).

¶ 37    A person is legally accountable for the conduct of another if "either before or during the commission of an offense, and with the intent to promote or facilitate that commission, he or she solicits, aids, abets, agrees, or attempts to aid that person in the planning or commission of the offense." *Id*. § 5-2(c) (West 2022). "[T]o prove that a defendant possessed the intent to promote or facilitate the crime, the State may present evidence that either (1) the defendant shared the criminal intent of the principal or (2) there was a common criminal design." *People v. Fernandez*, 2014 IL 115527, ¶ 13.

¶ 38    Viewing the evidence in the light most favorable to the State, a rational trier of fact could find that the State proved defendant guilty of attempted robbery and aggravated battery beyond a reasonable doubt. The State presented Beam's testimony, which established that as a transit

passenger on the CTA, he was approached by defendant and another man wearing black who entered his train car together from another car. Defendant "eyeballed" Beam's possessions. Then, the man in black attempted to grab Beam's phone, and defendant joined the struggle. Beam testified that one of them stated "give us your s*** or we're going to f*** you up" and they both attacked him, with the man in black choking him. Eventually, the men threw Beam to the ground and the man in black kicked his face. After Beam stood, and the men began to retreat, Beam stabbed defendant in the back with a small knife. The video evidence largely supported Beam's testimony, showing defendant and the man in black moving together from another train car to Beam's and then approaching Beam. The man in black attempts to take something from Beam's hand, but Beam resists. Defendant stands next to the man in black and attempts to hold Beam as the man briefly chokes Beam against the train window. Defendant throws Beam to the floor and the man in black kicks Beam's head. These events are sufficient to establish that defendant aided the man in black in attempting to rob Beam, and that defendant committed aggravated battery against him. See 720 ILCS 5/18-1(a), 8-4(a) 12-3.05(d)(7), 5-2(c) (West 2022).

¶ 39    Defendant nevertheless contends that, first, that the video evidence contradicted Beam's testimony that he attacked Beam. He contends that the footage shows that he tried to get between Beam and the man in black and attempted to separate them and end the fight. He also argues that no evidence supports the position that defendant attempted to take Beam's phone. We do not view the video evidence the way that defendant posits. Initially, the video footage does not contain sound, so it does not contradict Beam's testimony regarding defendant's threats toward him. A trier of fact could, first, easily determine that the man in black and defendant were working together as they both entered the train car at the same time, and surrounded Beam. The man in black, who wore a balaclava, was the primary actor in attempting to rob Beam, but defendant moved to assist

the him when he choked and held a struggling Beam against the window of the train. Beam continues to struggle and pushes against the men into the aisle. Only at that point, defendant puts his body between the man in black and Beam and throws Beam to the ground. To the extent that defendant posits that he was a bystander who only assisted in stopping the fight, the video evidence does not support such a position. The video clearly shows the men working in concert to restrain Beam.

¶ 40 Defendant also contends that the video supports the inference that Beam was the initial aggressor in the fight because he stabbed defendant after defendant disengaged and turned to leave the train car. He argues that Beam's inconsistent testimony regarding these events supports this inference. Importantly, Beam stabbed defendant only at the end of the incident, after Beam had been violently attacked by both defendant and the man in black. Even if Beam testified inconsistently with the video, that does not detract from the conclusion that the video clearly depicts that Beam was not the initial aggressor.

¶ 41 Further, defendant argues that Beam's inconsistent testimony creates reasonable doubt as to defendant's guilt. He notes that Beam testified that defendant attacked him, was unsure whether defendant or the man in black demanded Beam give them his phone, and "moved closer" to defendant to stab him. Defendant also asserts that defense counsel impeached Beam by establishing that he "falsely told detectives that [defendant] left and then reentered his train car after the stabbing."

¶ 42 Defendant's contentions are merely a request for this court to reweigh the evidence, which is not a function of this court. See *Brown*, 2013 IL 114196, ¶ 48. The jury heard Beam's testimony and viewed the video, which included the alleged inconsistencies. "Minor inconsistencies in the testimony between witnesses or within one witness's testimony may affect the weight of the

evidence but do not automatically create a reasonable doubt of guilt." *People v. Corral*, 2019 IL App (1st) 171501, ¶ 85; see also *People v. Peoples*, 2015 IL App (1st) 121717, ¶ 67 ("The trier of fact is free to accept or reject as much or as little of a witness's testimony as it pleases."). Notwithstanding defendant's argument to the contrary, nothing in the report of proceedings supports the conclusion that no rational trier of fact could have found that defendant battered Beam or attempted to rob him. As the evidence is not so "unreasonable, improbable, or so unsatisfactory as to justify a reasonable doubt of the defendant's guilt," we affirm defendant's convictions. See *Jackson*, 232 Ill. 2d at 281.

¶ 43                                    B. *Lynch* Motion

¶ 44        Defendant next contends that the trial court abused its discretion in denying defendant's *Lynch* motion to admit evidence showing that Beam had previously choked and scratched a romantic partner. Defendant argues that during the hearing, the court acknowledged that Beam could have been the initial aggressor, but impermissibly excluded this relevant evidence, thus denying him his right to a fair trial.

¶ 45        We will not reverse the trial court's ruling regarding the admission of evidence absent an abuse of discretion. *People v. Barnes*, 2017 IL App (1st) 143902, ¶ 40. "A court abuses its discretion where its decision is arbitrary, fanciful, or unreasonable, or where no reasonable person would adopt the view taken by the trial court." *Id*.

¶ 46        In *People v. Lynch*, the supreme court established that when a defendant raises a theory of self-defense, "the victim's aggressive and violent character is relevant to show who was the aggressor, and the defendant may show it by appropriate evidence, regardless of when he learned it." *Lynch*, 104 Ill. 2d at 200. Accordingly, under *Lynch*, evidence of the victim's violent and aggressive character may be offered (1) to show that the defendant's knowledge of the victim's

violent inclinations affected his or her perception of and reaction to the victim's behavior, or (2) to support the defendant's version of the facts when conflicting accounts of the events exist. *People v. Salas*, 2011 IL App (1st) 091880, ¶ 94. "*Lynch* only applies where the theory of self-defense is supported by the evidence." *Id*.

¶ 47        As the record establishes, defendant and Beam did not know one another. Thus, defendant proceeded under the second basis for offering evidence of Beam's violent character: to support the defendant's version of the facts where conflicting accounts of the incident exist. See *id*. In this case, at the pretrial hearing, the court found a question of fact as to the initial aggressor in the incident, based upon the representations of counsel. As noted, however, the CTA footage establishes that defendant was the initial aggressor in the incident. The court acknowledged this fact in its pronouncement of sentence, noting that defendant was the "driving factor and cause" of the situation. *Lynch* is, thus, inapplicable because defendant's theory of self-defense was not supported by the evidence. See *id*.

¶ 48        However, even considering the court's limited knowledge of the facts at the time of the motion *in limine*, the court did not abuse its discretion in denying defendant's motion regarding Beam's February 2, 2015, arrest.[3] This arrest related to an incident where Beam allegedly choked and scratched his former boyfriend. Even though the 2015 arrest was technically admissible to show Beam's violent character, the court still retained "the right to consider whether the prejudicial value of the evidence substantially outweigh[ed] its probative value, whether the evidence [was] overly cumulative, or whether other issues of undue delay or inefficiency counsel[ed] against

_____

[3] As defendant does not challenge the trial court's denial of his motion related to Beam's 2005 arrest, this issue is forfeited. See Ill. Sup. Ct. R. 341(h)(7) (eff. Nov. 1, 2025) ("Points not argued are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing.").

admission." See *People v. Degrave*, 2023 IL App (1st) 192479, ¶ 88. The trial court had discretion to determine that the incident lacked sufficient probative value especially in comparison with the significant prejudicial value of the evidence. It denied defendant's motion in part because it found that Beam's arrest for domestic battery would not necessarily be probative of his violent tendencies toward a stranger. We cannot say that this decision was unreasonable or fanciful. See *Barnes*, 2017 IL App (1st) 143902, ¶ 40. Accordingly, the trial court did not abuse its discretion in denying defendant's *Lynch* motion with regard to Beam's 2015 arrest. See *id.*

¶ 49                                    C. Ineffective Assistance of Counsel

¶ 50          Finally, defendant argues that his trial counsel provided constitutionally ineffective assistance where they failed to present evidence regarding Beam's prior arrests that the trial court deemed admissible during the pretrial hearing. Defendant contends that because the case "boiled down" to a credibility contest between defendant and Beam regarding the events, trial counsel was ineffective in presenting this evidence as it likely would have changed the outcome of the trial.

¶ 51          We review claims of ineffective assistance of counsel using the two-part test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Manning*, 241 Ill. 2d 319, 326 (2011). To establish a claim of ineffective assistance, a defendant must demonstrate that (1) counsel's performance was objectively unreasonable under prevailing professional norms, and (2) the deficient performance prejudiced the defendant. *People v. Veach*, 2017 IL 120649, ¶ 30. In order to establish prejudice, the defendant must show a reasonable probability that, but for the errors, the result of the proceeding would be different; namely, a "probability sufficient to undermine confidence in the outcome." *Id*. A defendant must satisfy both prongs to raise a successful claim. *Id*. Our review is *de novo*. *People v. Demus*, 2016 IL App (1st) 140420, ¶ 21.

¶ 52        Decisions regarding which witnesses to call and what evidence to present are matters of trial strategy and are thus generally immune from claims of ineffective assistance of counsel. *People v. Munsen*, 206 Ill. 2d 104, 139-140 (2002). A defendant is entitled to competent rather than perfect representation, and mistakes in strategy or tactics do not, of themselves, render counsel's representation incompetent. *People v. Johnson*, 372 Ill. App. 3d 772, 777-78 (2007). Due to the "variety of factors" affecting trial strategy, "such claims of ineffective assistance of counsel must be judged on a circumstance-specific basis, viewed not in hindsight, but from the time of counsel's conduct, and with great deference accorded counsel's decisions on review." *People v. Fuller*, 205 Ill. 2d 308, 330-31 (2002).

¶ 53        Here, defendant cannot prevail on his ineffectiveness claim because he suffered no prejudice from trial counsel's actions. As discussed, the video evidence that the jury observed showed that Beam was not the initial aggressor in the incident, but rather was sitting alone in the train car during the commute. Defendant and the man in black entered Beam's train car together and approached Beam. The men then subjected Beam to a violent assault, which included the man in black choking Beam with defendant assisting in holding him against the train window. Given these facts, it is unlikely that the jury could have concluded that Beam was the initial aggressor, such that defendant's self-defense claim would have been successful. See *Veach*, 2017 IL 120649, ¶ 30. As defendant cannot establish prejudice, his ineffective assistance of counsel claim fails. See *id*.

¶ 54                                    III. CONCLUSION

¶ 55        For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 56        Affirmed.